UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

===

United States of America

v.

Ernest Green et al.,

Defendants.

**Decision and Order**
**and**
**Report and Recommendation**

12-CR-83S

===

## I.   INTRODUCTION

The Hon. William Skretny has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 3.)  Pending before the Court are omnibus non-dispositive and dispositive motions from defendants Ernest Green ("Green"), Rodshaun Black ("Black"), Daniel Rodriguez ("Rodriguez"), John W. Coronado, Jr. ("Coronado"), and Amilcar Ramos ("Ramos").  The motions address different aspects of the charges against all of the defendants under the Hobbs Act, 18 U.S.C. § 1951.  The Court held oral argument for the omnibus motions on December 4, 2012, August 19, 2014, March 19, 2015, and June 3, 2015.  The Court held evidentiary hearings on February 19, 2014, October 28, 2014, and July 14, 2015.  The Court now issues its non-dispositive decisions and dispositive recommendations for each defendant as explained below.  The table of contents appearing on the next page will help the reader navigate the various issues raised by each defendant.

I.    INTRODUCTION ...................................................................................................1
II.   BACKGROUND .....................................................................................................3
III.  DISCUSSION ..........................................................................................................5
    A.   Ernest Green ......................................................................................................5
        i.    Motion for Rule 16 Discovery (Non-dispositive) ...................................5
        ii.   Motion for Brady / Jencks / Giglio Material (Non-dispositive) ...............6
        iii.  Motion for FRE 404(b), 608, and 609 Material (Non-dispositive).........8
        iv.  Motion for Preservation of Notes (Non-dispositive) ............................8
        v.   Motion for Discovery Concerning Identification Procedures (Non-dispositive) ............9
        vi.  Motion to Dismiss Counts 6–9 of the Superseding Indictment (Dispositive)........9
        vii.   Motion to Sever Counts 6–9 of the Superseding Indictment (Dispositive) ........11
        viii.  Motion to Suppress Statements from January 7, 2010 (Dispositive) ..........12
        ix.  Motion to Suppress Recorded Jail Calls (Dispositive) .........................20
        x.   Motion to Suppress Tangible Property or Evidence (Dispositive)..........20
    B.   Rodshaun Black .............................................................................................22
        i.    Motion for Rule 12(b) Notice (Non-dispositive) ................................22
        ii.   Motion for Rule 16 Discovery (Non-dispositive) ...............................23
        iii.  Motion for Brady / Jencks / Giglio Material (Non-dispositive)...............23
        iv.  Motion for FRE 404(b) and 609 Material (Non-dispositive) ..................24
        v.   Motion to Suppress Inmate Telephone Calls (Dispositive) ..................24
        vi.  Motion to Suppress Derivative Use of Inmate Telephone Calls (Dispositive) ............31
        vii.   Motion to Suppress Other Statements and Evidence (Dispositive) ........31
        viii.  Motion to Suppress Identification Evidence (Dispositive) ...................37
    C.   Daniel Rodriguez ...........................................................................................40
        i.    Motion for Bill of Particulars (Non-dispositive) .................................40
        ii.   Motion for Rule 16 Discovery (Non-dispositive) ...............................42
        iii.  Motion for Disclosure of Grand Jury Minutes (Non-dispositive)..........43
        iv.  Motion for Henthorn Discovery (Non-dispositive) .............................43
        v.   Motion for Disclosure of Confidential Informants (Non-dispositive) ......44
        vi.  Motion for Brady / Jencks / Giglio Material (Non-dispositive) ..............46
        vii.   Motion for Disclosure of Expert Witnesses (Non-dispositive) ..............46
        viii.  Motion for Discovery Under FRE 403, 404(b), 609, and 807 (Non-dispositive) ......46
        ix.  Motion to Suppress (Dispositive)......................................................47
        x.   Motion to Suppress Identification Evidence (Dispositive) ...................52
    D.   John W. Coronado, Jr. .....................................................................................54
    E.   Amilcar Ramos ..............................................................................................54
        i.    Non-dispositive Motions .................................................................54
        ii.   Motion for Voir Dire of Government Experts (Non-dispositive)............55
        iii.  Motion for Severance (Dispositive)....................................................55
        iv.  Motion for Suppression of Statements (Dispositive) ...........................56
IV.  CONCLUSION ......................................................................................................56
V.   OBJECTIONS ........................................................................................................56

## II.    BACKGROUND

This case concerns allegations that defendants kidnapped, robbed, and killed someone named Jabril Harper ("Harper"); and kidnapped and robbed a second victim known only as "M.S."; all as part of a violent conspiracy that violated the Hobbs Act.  Some basic information about the underlying crimes first appeared in the complaint that the Government filed against Green only on February 23, 2012.  (*See* Case No. 12-MJ-2037, Dkt. No. 1.)  According to the Government, "Harper was known to BPD [Buffalo Police Department] to be engaged in possessing and distributing drugs out of the Shoreline Apartments in Buffalo, New York.  Harper's criminal history includes arrests for criminal possession of a weapon and possession of a controlled substance." (*Id.* at 3.)  The Government then explained in the complaint how then-undisclosed accomplices of Green ordered Harper at gunpoint to accompany them to a van outside Harper's residence, where they assaulted him and robbed him.  (*Id.* at 5.)  After the assault and robbery, Green and others allegedly put Harper in the trunk of a different vehicle, drove him to Roosevelt Park, and shot him in the head.  (*See id.* at 6–7.)  The original indictment, filed on March 6, 2012, contained Hobbs Act charges against only Green, Black, and Rodriguez.  (Dkt. No. 1.)

On December 12, 2014, the Government filed a superseding indictment, which named all five defendants.  The superseding indictment contains nine counts.  In Count One, the Government accuses all five defendants of Hobbs Act conspiracy in violation of 18 U.S.C. §§ 1951(a) and 2.  The conspiracy in Count One includes "the robbery and extortion of assets, including jewelry, mobile telephones, cocaine base, and United States currency, from Jabril Harper a/k/a Bril, an individual engaged in the unlawful possession and distribution of controlled substances, including cocaine base." (Dkt. No. 155 at 2.)  In Count Two, the Government accuses

3

all five defendants of Hobbs Act robbery and extortion in violation of 18 U.S.C. §§ 1951(a) and 2.

The robbery and extortion allegedly occurred against Harper on December 16, 2009.  In Count

Three, the Government accuses all five defendants of kidnapping Harper on December 16, 2009,

in violation of 18 U.S.C. §§ 1201(a)(1) and 2.  In Count Four, the Government accuses Green,

Black, Rodriguez, and Coronado of causing Harper's death on December 16, 2009 through the

use of a firearm, in violation of 18 U.S.C. §§ 924(j)(1) and 2.  In Count Five, the Government

accuses all five defendants of violating 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii),

924(c)(1)(A)(iii), and 2 on December 16, 2009.  Defendants allegedly violated these provisions in

that they "did knowingly and unlawfully use, carry, brandish and discharge, and in furtherance of

such crimes, did knowingly and unlawfully possess, brandish and discharge, a firearm."  (*Id.* at 5.)

In Count Six, the Government accuses Green and Black of Hobbs Act conspiracy in violation of

18 U.S.C. §§ 1951(a) and 2.  The alleged conspiracy began on January 4, 2010 and included "the

robbery and extortion of assets, including controlled substances, United States currency, jewelry,

an iPhone, and a North Face coat, from M.S., a person known to the Grand Jury, an individual

engaged in the unlawful possession and distribution of controlled substances, including cocaine

base."  (*Id.* at 6.)  In Count Seven, the Government accuses Green and Black of Hobbs Act robbery

and extortion in violation of 18 U.S.C. §§ 1951(a) and 2.  The alleged conduct also occurred on

January 4, 2010 and involved the incident with M.S.  In Count Eight, the Government accuses

Green and Black of kidnapping M.S. on January 4, 2010, in violation of 18 U.S.C. §§ 1201(a)(1)

and 2.  In Count Nine, the Government accuses Green and Black of possessing and brandishing a

firearm during the incident with M.S., in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 2.

The Court previously issued orders directing preliminary disclosures and laying the foundation for evidentiary hearings.  (Dkt. Nos. 78, 82.)

The Court will discuss further background information as necessary when addressing each of defendants' motions.

## III.    DISCUSSION

Defendants have filed a number of motions for joinder.  (*See, e.g.*, Dkt. No. 30 at 26; Dkt. No. 42 at 11; Dkt. No. 43 at 5; Dkt. No. 44 at 6; Dkt. No. 64; Dkt. No. 191 at 21; Dkt. No. 201-1 at 8; Dkt. No. 292.)  The Court grants the motions in part, recognizing that non-dispositive requests often are similar while dispositive requests often reflect the particular standing and other circumstances of an individual defendant.  Unless otherwise noted: 1) each of the Court's non-dispositive rulings below will apply to all defendants, regardless of who filed the motion ; and 2) each of the Court's dispositive recommendations will apply only to the defendant who made the motion that was considered.

### A.  *Ernest Green*

Green filed his omnibus pretrial motions on multiple dates as seen in the docket.  (Dkt. Nos. 33, 44, 140, 191.)

#### i.    *Motion for Rule 16 Discovery (Non-dispositive)*

Green seeks Federal Rules of Criminal Procedure ("FRCP") Rule 16 discovery including evidence derived from searches and seizures and evidence derived from identification procedures. Green's requests include a supplemental request for discovery pertaining to his parole arrest of

January 7, 2010; formatted data pertaining to recorded jail telephone calls; procedural information

pertaining to the acquisition of Cricket call detail records; and documents related to certain

identification procedures that affect Green.  (Dkt. No. 191 at 20–21.)  The Government has

responded broadly that it has furnished Rule 16 discovery including several dozen computer disks

("CDs") of information, and that it will abide by the continuing obligation to disclose.  To the

extent that any specific requests remain outstanding, the Government is directed either to furnish

the information or to provide notice of an objection to production.

> ii.    *Motion for* Brady / Jencks / Giglio *Material (Non-dispositive)*

Green seeks information subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963),

the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. U.S.*, 405 U.S. 150 (1972).  "[S]uppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution . . . .  Society wins not only when the guilty are convicted but when criminal trials

are fair; our system of the administration of justice suffers when any accused is treated unfairly."

*Brady*, 373 U.S. at 87.  The *Brady* rule covers situations "[w]hen the reliability of a given witness

may well be determinative of guilt or innocence."  *Giglio*, 405 U.S. at 154 (internal quotation

marks and citation omitted); *accord U.S. v. Bagley*, 473 U.S. 667, 676 (1985) (plurality opinion)

("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule.")

(citing *Giglio*).  When considering information that might fall under the *Brady* rule, "[t]he question

is not whether the defendant would more likely than not have received a different verdict with the

evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The Government does

not necessarily have to await a defense request to produce information that falls under the *Brady*

rule, but neither does it need to adopt an "open file policy."  *See id.* at 437; *see also U.S. v. Payne*, 63

F.3d 1200, 1208 (2d Cir. 1995) ("Under *Brady* and its progeny, the government has an affirmative

duty to disclose favorable evidence known to it, even if no specific disclosure request is made by

the defense.  The individual prosecutor is presumed to have knowledge of all information gathered

in connection with the government's investigation.") (citations omitted).  Also, "[e]vidence is not

'suppressed' if the defendant either knew, or should have known, of the essential facts permitting

him to take advantage of any exculpatory evidence."  *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir.

1982) (citations omitted).  As for the timing of *Brady* disclosure, "[i]t is not feasible or desirable to

specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the

sufficiency, under the circumstances, of the defense's opportunity to use the evidence when

disclosure is made.  Thus disclosure prior to trial is not mandated.  Indeed, *Brady* requires

disclosure of information that the prosecution acquires during the trial itself, or even afterward

. . . . At the same time, however, the longer the prosecution withholds information, or (more

particularly) the closer to trial the disclosure is made, the less opportunity there is for use."  *Leka v.

Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted).

Here, the Government has acknowledged its affirmative obligations for disclosure under

*Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that

the District Judge will set in the eventual trial order.  The Government's commitment will suffice,

absent a showing that a different arrangement is necessary in this case.

      iii.    *Motion for FRE 404(b), 608, and 609 Material (Non-dispositive)*

Green seeks notice of evidence that the Government would use at trial under Federal Rules of Evidence ("FRE") 404(b), 608, and 609.  FRE 404(b) governs requests for disclosure of all evidence of prior bad acts that the Government intends to use in its case-in-chief.  FRE 404 requires that defendants be given "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to use at trial."  To the extent that the Government intends to use any such evidence of a prior bad act in its case in chief, the Government shall produce all FRE 404(b) evidence as directed by the District Judge in the trial order.

With respect to Green's requests under FRE 608 and 609, the only notice requirement imposed by either Rule applies closer to trial.  FRE 609(b)(2) mandates that "the proponent [give] an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use."  To the extent that the Government intends to use at trial evidence falling under these rules, it must give reasonable notice as directed by the District Judge in the trial order.

      iv.    *Motion for Preservation of Notes (Non-dispositive)*

Green seeks an order requiring law enforcement agents who participated in this case to preserve their rough notes.  The Government does not appear to have responded specifically to Green's request but has not objected to preservation for other defendants that does not carry over to unwarranted disclosure.  (*See, e.g.*, Dkt. No. 205 at 14.)  The Court directs the Government to arrange for preservation of rough notes pending further instructions from the District Judge at trial.

8

     *v.*    *Motion for Discovery Concerning Identification Procedures (Non-dispositive)*

On December 28, 2012, Green filed a supplemental motion for discovery concerning

identification procedures that the Government disclosed during initial discovery.  (Dkt. No. 44 at

3–5; Dkt. No. 57.)  The motion was non-dispositive in itself but ended with a request for hearing,

as a prelude to a possible argument to suppress identification evidence.  Among other issues,

Green specifically questioned the ability of witness Edmund Buggs to identify him based on a prior

view at the time of the alleged offense.  (*See* Dkt. No. 57 at 2.)  The Court previously deferred until

trial Green's questions about Buggs's ability to observe him.  (Dkt. No. 82 at 4.)  The Court will

leave its previous decision undisturbed, subject to revisiting by the District Judge as the date for

trial approaches.

     *vi.*    *Motion to Dismiss Counts 6–9 of the Superseding Indictment (Dispositive)*

Green filed a motion on March 30, 2015 to dismiss Counts Six through Nine of the

superseding indictment, under Rule 12(b)(3)(A) and the Fifth Amendment.  (Dkt. No. 191 at 5.)

Counts Six through Nine pertained to the alleged events of January 4, 2010 against victim M.S.

and appeared for the first time in the superseding indictment.  Green argues that none of the

alleged events constitute continuing offenses and that the statute of limitations in 18 U.S.C.

§ 3282 would have applied as of January 4, 2010.  Green acknowledges that the Government filed

the superseding indictment on December 12, 2014, just barely within the five-year limitations

period that would have started from January 4, 2010.  Nonetheless, Green argues for dismissal on

the basis that he has suffered prejudice from the Government's delay in bringing the additional

charges.  Green notes that Counts Six through Nine could have been brought much earlier

because the investigation of the alleged incident was substantially complete by 2012.  Green also

asserts that bringing the additional charges so much later prolonged his pretrial detention for no reason. The Government responds that Green has not made a showing that he has suffered actual prejudice or that the Government has gained an unfair tactical advantage from the timing of the superseding indictment. (*See* Dkt. No. 206 at 3-4.)

The Due Process Clause of the Fifth Amendment would require dismissal of the superseding indictment if Green could establish: 1) that any delay in the issuance of the superseding indictment caused substantial prejudice to his rights to a fair trial; and 2) that the delay was an intentional device to gain tactical advantage over him. *See U.S. v. Marion*, 404 U.S. 307, 324 (1971) (citations omitted); *U.S. v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009) ("[A] defendant must show both prejudice and an unjustified reason for the delay in order to prove a due process violation.") (citation omitted). "These considerations, moreover, are not independent prongs of a two-part test to be evaluated in isolation from each other. Rather, they are related factors to be weighed in light of each other and the surrounding circumstances." *Id.* at 199–200 (citations omitted). The Supreme Court has set a high standard for substantial prejudice resulting from investigative delay:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of mere speed. This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*U.S. v. Lovasco*, 431 U.S. 783, 795–96 (1977) (internal quotation and editorial marks and citations omitted).

Here, Green has not shown what substantial prejudice to his rights he has suffered or how that prejudice resulted from intentional tactics.  Green has not demonstrated "the loss of documentary evidence or the unavailability of a key witness."  *U.S. v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (citations omitted).  Green has not disproven that the Government needed time to prepare an orderly prosecution for Counts Six through Nine.  As for prolonged pretrial detention, the Court told Green at least twice in person that he was free to pursue a severance motion with the District Judge if he felt that his pretrial detention ran too long.  (*See* Dkt. Nos. 137, 164.) Green never pursued a formal severance motion until the alternative motion that he filed with this motion to dismiss, which will be discussed below.  Without a prior severance motion, Green was left with the principle that the Speedy Trial Act "imposes a unitary time clock on all co-defendants joined for trial."  *U.S. v. Vasquez*, 918 F.2d 329, 337 (2d Cir. 1990).  For these reasons, the Court recommends denying Green's motion.

vii.     *Motion to Sever Counts 6–9 of the Superseding Indictment (Dispositive)*

As an alternative proposal to dismissal of Counts Six through Nine of the superseding indictment, Green moves to sever them from the other counts.  (Dkt. No. 191 at 8.)  Green acknowledges a possibility that FRCP 8(a) technically allows all the counts in the superseding indictment to be tried together.  Nonetheless, Green notes that Counts One through Five concern much more serious allegations about the murder of a robbery victim.  Counts Six through Nine, in contrast, concern less serious allegations about a robbery of a different victim that occurred on a different date.  The two robberies, according to Green, have nothing to do with each other except

through the allegations of an overarching Hobbs Act conspiracy.  Green believes that he cannot receive a fair trial on Counts Six through Nine once the jury hears the murder allegations.  The Government responds that the charges are properly joined, that they are part of a common scheme or plan under FRE 404(b), and that instructions to the trial jury can address any concerns about potential prejudice.  (*See* Dkt. No. 206 at 4–5.)

This Court has a practice of deferring severance motions to the District Judge, who is in a better position to determine whether two or more trials in a case would better preserve defendants' rights.  The Court will maintain that practice here and recommends that Green pursue the motion as he sees fit with the District Judge.

viii.    *Motion to Suppress Statements from January 7, 2010 (Dispositive)*

Green moves to suppress statements that he allegedly gave to police officers following his parole arrest on January 7, 2010.  (Dkt. No. 191 at 12.)  That night, a state parole officer arrested Green at his residence at 17 McNeeley Way in the City of Buffalo and transported him to Buffalo Police Department headquarters.  According to a police report, Green received *Miranda* warnings before he was interviewed and made statements about his knowledge of Harper's death.  Green does not recall receiving *Miranda* warnings.  Green also contends that the interview was improperly overbearing, even before he terminated the interview by demanding to go home and by jumping out of a third-story window at headquarters.

The Court held an evidentiary hearing on July 14, 2015 concerning Green and the events of January 7, 2010.  (Dkt. No. 222.)  Prior to January 7, 2010, state parole officer Charles Sears ("Sears") was informed that Green failed to report a police contact and that a parole violation warrant subsequently issued.  (*Id.* at 15, 19.)  According to Government Exhibit 4, a parole

12

violation report, Lancaster Police arrested Green on December 25, 2009 at 2:29 AM at a motel in

the Lancaster area.  Lancaster Police arrested Green for possession of a stolen 2003 Buick Century.

Green purportedly generated four parole violations on December 25, 2009: failure to be at an

approved residence during curfew hours; possession of a motor vehicle without the owner's

permission; possession of stolen property; and failure to contact his parole officers about the

incident.  Sears then drew up a plan to have about a half-dozen parole officers go to Green's

residence, prepared to arrest and to search.  Parole officers arrived and knocked on the door.

Green's mother answered the door and let the officers in.  Green came downstairs to meet the

officers; Green's girlfriend came downstairs shortly thereafter.  Once the three residents of the

house were in the same room, parole officers proceeded to search the house.  Sears testified that

parole officers routinely search an entire residence when executing a warrant but that in this

instance, the officers had the additional reason of a Buffalo Police alert.  Buffalo Police had alerted

the parole officers that Green was the subject of an investigation concerning a murder and a

robbery of a ring.  (*Id.* at 32.)  During the search that unfolded, Sears secured a gun that was visible

from Green's girlfriend's purse and contacted Buffalo Police to pursue the matter.  (*See id.* at 21.)

When Sears saw the gun,

> I yelled down the stairs "gun" which means—and this we coordinate too,
> everybody gets handcuffed.
>
> At that point Mr. Green decided to fight with the parole officers.  His
> girlfriend decided to fight with the parole officers and was actually trying to pull the
> gun out of the parole officer's holster.  So we had to subdue Mr. Green and then
> subdue the girlfriend and have them—get them handcuffed and under control.
>
> But Mr. Green put up quite a fight.

(*Id.* at 22–23.)  Sears testified that the discovery of the gun expanded the scope of the search from

13

a "cursory search" that would not necessarily cover every room to a full search of the entire house. (*Id.* at 43.)  Green made no inculpatory statements about this case during the events that unfolded. (*Id.* at 24.)  Parole officers did ask Green about the unreported police contact that prompted the warrant.  (*Id.* at 25.)  Parole officers also asked Green whether he owned the gun found in the person; Green said no.  (*Id.*)  The events at Green's house ended when Buffalo Police took custody of Green to investigate the gun that was found.  (*Id.* at 25–26.)

Daniel Rinaldo ("Rinaldo") of the Buffalo Police Department interviewed Green once he arrived at police headquarters.  (*Id.* at 55.)  Michael Mordino ("Mordino"), Michael Acquino ("Acquino"), and another officer attended the interview as well.  Rinaldo read Green his *Miranda* rights.  Rinaldo then asked the Green whether Green realized where he was.  Green responded with a series of statements that included a question about where his co-defendant Rodriguez was; a question to Rinaldo about whether Rinaldo was from the Homicide Bureau; and a statement to Rinaldo that he could make Rinaldo's life easier because he knew about Harper's murder.  (*Id.* at 56.)  Green then offered that he "would speak to us if he could have a cigarette, a cup of coffee and go to the men's room."  (*Id.* at 57.)  Rinaldo provided what Green wanted, at which point Green asked for a chance to speak to his girlfriend, whom parole officers had brought to police headquarters.  (*Id.*)  During the conversation between Green and his girlfriend, "he got very close to Ashley, and then he took a ring off his finger and put it in her hand very surreptitiously, and that's when we walked in and we ended their conversation and we confiscated the ring out of her hand."  (*Id.* at 58.)  When Rinaldo came back to the subject of Harper's murder, Green offered that if he were released that night then he would return the next day with information.  (*Id.*)

14

Rinaldo testified that questioning ended at that point, but "at some point we were intending on

continuing the questioning, we got him something to eat and then he escaped from police

headquarters by jumping out of a third floor window." (*Id.* at 59.) Green was apprehended a

short time later.

Green makes several arguments in post-hearing briefing in further support of suppression.

Green has pointed out a possible discrepancy in Sears's testimony.  While Sears testified that

Green was not handcuffed until the discovery of the gun, "the witness acknowledged that it was

Officer Hart who immediately encountered Mr. Green upon entry into the first room of the

residence and that Mr. Green was immediately handcuffed." (Dkt. No. 230 at 12.)  Green also

tries to make a distinction about when the arrest warrant for the parole violation could have been

considered executed:

> The witness acknowledged that Mr. Green was detained at that point in time and
> that the parole arrest warrant had been executed.  The witness acknowledged that
> the parties could have left the residence with Mr. Green at that time but instead
> searched the whole residence, where a female with a gun in a purse was
> subsequently encountered upstairs.  Prior to execution of the parole arrest warrant,
> the witness acknowledged that Officer Hart had previously made an entry into
> parole records that parole was to search Mr. Green's residence due to information
> provided by the Buffalo Police Department.  The witness further indicated that
> normal procedure would have been to transport a parolee after arrest to the Erie
> County Holding Center for booking, but that in Mr. Green's case, he was to be
> transported after arrest to police headquarters because "Buffalo homicide wanted to
> speak with him."

(*Id.* at 12–13 (transcript citations omitted).)  Based on this information, Green asserts that "the

Buffalo Police Department specifically orchestrated the parole arrest and search of Mr. Green's

residence in order to advance another pending investigation separate from his status as a parolee

. . . . [A] parole officer's search may be unlawful when it is merely a conduit for doing what the

police could not otherwise do and a parolee's status should not be exploited to allow a search which is designed solely to collect contraband or evidence in aid of the prosecution of an independent criminal investigation." (*Id.* at 14 (internal quotation marks and citations omitted).)

The Government responds first that "failing to recall certain conversations with law enforcement does not give rise to a factual dispute." (Dkt. No. 206 at 7.)  More importantly, now that hearings have concluded, the Government argues that Green's conditions of parole made all of the events of January 7, 2010 proper.  According to the Government, "Green's parole officer had timely information from the Buffalo Police Department that Green had had recent police contact that Green had not reported to the police officer.  This conduct is a 'violation in an important respect' of the conditions of release on parole.  (July 14 Tr. at 51.)  Accordingly, the warrant for his arrest based on the parole violation was justified.  Under these circumstances, execution of the warrant and concomitant search of Green's approved residence, which resulted in location and seizure of physical evidence, including a loaded .38 caliber handgun, did not violate the Fourth Amendment." (Dkt. No. 231 at 11.)  As for any concerns about *Miranda* warnings, "[t]he undisputed testimony shows that prior to any questioning, Detective Sergeant Rinaldo advised Green of his *Miranda* rights.  Green acknowledged his rights, expressed that he understood his rights, and agreed to speak to the officers.  He then made various inculpatory statements." (*Id.* at 12.)

As part of the information that emerged at the hearing, the Government submitted Exhibit 1, a copy of Green's Certificate of Release for his state parole.  The Certificate of Release listed a number of conditions that the state imposed as part of Green's parole.  A prefatory paragraph

16

above the conditions began with the sentences, "I, GREEN, Ernest 04B3313, voluntarily accept

Parole supervision.  I fully understand that my person, residence and property are subject to search

and inspection."  *See also* 9 N.Y.C.R.R. § 8003.1(c) ("Parole or conditional release will not be

granted to any individual unless he states in writing, in the presence of a witness, that he has read

and understood the conditions of release.").  In condition number four, Green agreed that "I will

permit my Parole Officer to visit me at my residence and/or place of employment and I will permit

the search and inspection of my person, residence and properly."  The search condition on its face

came with no language about a required level of suspicion.

   "When an officer has reasonable suspicion that a probationer subject to a search condition

is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that

an intrusion on the probationer's significantly diminished privacy interests is reasonable." *U.S. v.

Knights*, 534 U.S. 112, 121 (2001).  The Government here has demonstrated how the theft of a car

and the violation of curfew on December 25, 2009 led to a violation report and a parole warrant

for which Green had to answer.  Additionally, "in certain circumstances government investigators

conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or

probable-cause requirements as long as their searches meet reasonable legislative or administrative

standards."  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks and citations

omitted).  More specifically, "the Fourth Amendment does not prohibit a police officer from

conducting a suspicionless search of a parolee." *Samson v. California*, 547 U.S. 843, 857 (2006).  A

search with no suspicion will be upheld if conducted under a regulatory scheme that is structured

to provide intense supervision and that establishes unambiguous awareness of and consent to

17

suspicionless searches.  *See id.* at 852–53.  This is where Green's arguments fall short.  Green

consented to suspicionless searches when he reviewed and signed his conditions of parole.  The

events of December 25, 2009 supported the issuance of a parole warrant, but in light of Green's

criminal history, those events also would have reminded parole officers "that a State's interests in

reducing recidivism and thereby promoting reintegration and positive citizenship among

probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under

the Fourth Amendment."  *Id.* at 853 (citations omitted); *see also U.S. v. Massey*, 461 F.3d 177, 179

(2d Cir. 2006) ("[T]he state has a legitimate interest in closely monitoring the activities of its

parolees, and a home visit is a routine and appropriate element of supervising a convicted

person.") (internal quotation and editorial marks and citation omitted).  Once the officers were in

Green's residence, the discovery of the gun would have created probable cause to believe that

Green had committed a firearm offense and a further violation of parole, which in turn set in

motion the rest of the events on January 7, 2010.  Only at this point did Buffalo Police become

involved, contrary to Green's assertions.  The parole officers knew about a murder and a robbery

of a ring but planned no tactics specifically based on that information.

    With respect to the rest of the events on January 7, 2010, Green has failed to show

improper conduct by the police officers.  "Without the right to cut off questioning, the setting of

in-custody interrogation operates on the individual to overcome free choice in producing a

statement after the privilege has been once invoked.  If the individual states that he wants an

attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S.

436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does

not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445.  The invocation of the right to remain silent must be unambiguous; if it is then the defendant cuts off all questioning about that offense.  *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation omitted).  Here, the Government has provided credible evidence that Green did in fact receive *Miranda* warnings before the officers broached any subjects with him.  The record indicates that Green then initiated conversation with officers before the officers asked any questions, asking where co-defendant Rodriguez was and then volunteering that he could make the officers' "life real easy today" by volunteering information about Harper's murder.  Green then had enough presence of mind to make requests of the officers, to change his mind about talking before speaking to his girlfriend, to offer to come back the next day, and to escape from the third-floor window.  *Cf. U.S. v. Copeland*, 830 F. Supp. 216, 218 (S.D.N.Y. 1993) ("All of the evidence indicates that Copeland was in control of his actions at all times and deliberately chose to talk with the inspectors about topics of his own choice while retaining the prerogative to limit those topics; at no time was there any indication that Copeland's will was overborne.").  These circumstances all indicate that Green received appropriate advice about his rights, that he never invoked his right to remain silent, and that he was not overwhelmed by his surrounding custodial environment.  The Court thus recommends denying Green's motion.

19

ix.     *Motion to Suppress Recorded Jail Calls (Dispositive)*

Green joins Black's earlier-filed motion to suppress certain inmate telephone calls.  (Dkt.

No. 191 at 14.)  Discovery apparently has uncovered approximately 132 calls that Green made

from the Erie County Holding Center ("Holding Center") between January and April 2010.

Based on the discovery of these telephone calls, Green asserts standing to challenge the lack of

probable cause or consent that Black argues in his motion.  Green adds the post-hearing comment

that the Holding Center's practice of recording telephone calls "may appear consistent with

Second Circuit precedent as applied by the Western District in several recent cases.  However, in

its particulars, defendant Green argues that the policy and practice of the Erie County Holding

Center as implemented for the recording of inmate calls exceeds the authority of legal precedent

and presents another example of how technology and the practices of law enforcement have

outpaced the law."  (Dkt. No. 230 at 7.)

Since Green is adopting Black's arguments for suppression, the Court recommends

denying Green's motion for the reasons set forth below when addressing Black's motion.

x.     *Motion to Suppress Tangible Property or Evidence (Dispositive)*

Green has made a motion to suppress various tangible items seized from him, including a

firearm and cellular telephones seized during the parole arrest of January 7, 2010; a ring taken

from Green and his girlfriend at Buffalo Police headquarters on January 7, 2010; a blood-stained

tissue removed from a trash can in the men's bathroom at Buffalo Police headquarters on January

7, 2010; certain call detail records that police officers obtained through the Cricket telephone

service provider; identification evidence from a witness known as S.M., based on the unavailability

of the original photo array;[1] identification evidence from January 15, 2010 from a person known

as A.C.; and identification evidence from May 9, 2012 from M.S., the victim identified in Counts

Six through Nine of the superseding indictment.  (Dkt. No. 191 at 15–20.)

The Government argues against suppression of any of the above items.  The Government

defends the propriety of any of the seizures that occurred incident to a parole search that it

considers proper.  As for the ring and the bloody tissue, the Government responds that Green has

not done enough to establish a reasonable expectation of privacy, especially for a discarded item

like the tissue.  (*See* Dkt. No. 206 at 11–12.)  With respect to the identification evidence from

A.C., the Government has committed to providing information that should resolve that issue.

With respect to the identification evidence from M.S., the Government argues that Green has not

done enough to show that his photo stood out impermissibly in the photo array.  "Moreover the

referenced in-court identification would be grounded on an independent basis in memory in that

MS had a lengthy exposure to Green—he drove around captive with Green in a car—during that

robbery."  (Dkt. No. 206 at 13.)

At the conclusion of the evidentiary hearing on July 14, 2015, Green withdrew the motion

to suppress Cricket telephone records but without prejudice to renew if later discovery uncovered

a connection between those records and Green.  (Dkt. No. 222 at 71.)

The Court finds that suppression is not warranted for any of the items that Green has

identified.  The firearm and cellular telephones seized during the parole arrest of January 7, 2010

were seized incident to a search that occurred lawfully, as the Court explained above.  With respect

---

[1] For pretrial purposes, the Court considers the issue of original photo arrays to be moot now.  *See* Note 2 *infra* for further background.

21

to the ring and the tissue, Green "had no reasonable expectation of privacy in the holding room, any item left in the garbage there, or in the DNA that was collected" from the tissue. *Parisi v. Artus*, No. 08-CV-1785 ENV, 2010 WL 4961746, at *6 (E.D.N.Y. Dec. 1, 2010) (citations omitted); *see also Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) ("Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant search a person validly arrested.  The constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence.  The fact of a lawful arrest, standing alone, authorizes a search.") (citations omitted).  The identification evidence from "A.C.," now known as Antoine Callahan ("Callahan"), was proper for the reasons that the Court explains below for a similar motion from Black.  The identification evidence from victim M.S. is not subject to suppression for two reasons.  Green has not made enough of a showing that his presence in the photo arrays stood out enough to make any suggestions to the victim.  Even if Green's presence in the photo array had been improper, the victim would have had an independent recollection from the nature and duration of the robbery.  *See U.S. v. Crews*, 445 U.S. 463, 471 (1980); *Collins v. Scully*, 878 F. Supp. 452, 457 (E.D.N.Y. 1995).

Accordingly, the Court recommends denying Green's motion.

### B.  Rodshaun Black

Black filed his omnibus pretrial motions on September 26, 2012.  (Dkt. No. 30.)  Black filed supplemental motions on March 14, 2013 (Dkt. No. 63) and July 14, 2014 (Dkt. No. 140).

#### i.   Motion for Rule 12(b) Notice (Non-dispositive)

Black seeks notice under FRCP Rule 12 of the Government's intent to use evidence subject to Rule 16 disclosure or subject to a suppression motion under Rule 12(b)(3)(C).  To the

22

extent that the Government has not done so already, the Court directs it to furnish appropriate

notice.

      ii.    *Motion for Rule 16 Discovery (Non-dispositive)*

Black seeks Rule 16 discovery including evidence derived from searches and seizures and

evidence derived from identification procedures.  Black also made a supplemental request

pertaining to DNA testing.  Specifically, Black seeks "the original and amended ECFL [Erie

County Department of Police Services Forensic Crime Laboratory] protocols for testing applied in

every case, along with any documentation relating to the basis for amendment of the testing

protocols and the effect of the use of the new protocols upon the inclusion or exclusion of

contributors to any questioned DNA sample submitted for comparison."  (Dkt. No. 70 at 2.)  The

Government has responded that it has furnished Rule 16 discovery including several dozen CDs of

information, and that it will abide by the continuing obligation to disclose.  With respect to DNA

testing, "there has been no additional DNA testing of evidence related to the instant case beyond

that which has been already produced."  (Dkt. No. 69 at 1.)  To the extent that any specific

requests remain outstanding, the Government is directed either to furnish the information or to

provide notice of an objection to production.

      iii.    *Motion for* Brady */* Jencks */* Giglio *Material (Non-dispositive)*

Black seeks a variety of materials "pursuant to the Federal Rule of Criminal Procedure 16,

18 U.S.C. §§ 3432 and 3500, 21 U.S.C. § 848(j), the Fifth, Sixth and Eighth Amendments of the

U.S. Constitution, *Brady v. Maryland*, 373 U.S. 83, 87 [1963], the ABA Standards for Criminal

Justice, Prosecution Function and Defense Function 3-3.11(a), and the tenets of the Department

of Justices' *Criminal Resource Manual*."  (Dkt. No. 30 at 6.)  For any of the above materials that fall

23

within the scope of Rule 16, the Government will furnish the materials if it has not done so already, or will furnish notice of objections. For any *Brady* / Jencks / *Giglio* information, the analysis that the Court used above for Green's motion applies. The Government has acknowledged its affirmative obligations for disclosure under *Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that the District Judge will set in the eventual trial order. The Government's commitment will suffice, absent a showing that a different arrangement is necessary in this case.

     *iv.*   *Motion for FRE 404(b) and 609 Material (Non-dispositive)*

Black seeks disclosure of potential trial evidence concerning prior bad acts, prior convictions, or similar modes of impeachment under FRE 404(b) and 609. The analysis that the Court used above for a similar motion from Green applies here. To the extent that the Government intends to use at trial evidence falling under these rules, it must give reasonable notice as directed by the District Judge in the trial order.

     *v.*   *Motion to Suppress Inmate Telephone Calls (Dispositive)*

Black, joined by Green, seeks to suppress any evidence obtained from inmate telephone calls recorded at the Erie County Holding Center ("Holding Center"). Black contends that he has standing to challenge the recordings, that the recordings occurred without any warrant or order and without consent, and that any generic notice posted in the detention facility was insufficient. The Government responds that any calls that Black made would have been with implied consent to record. The implied consent, according to the Government, would have come from notice given in several forms. The Holding Center has a notice posted on or near inmate telephones that calls may be monitored or recorded. (Dkt. No. 41-4.) When inmates at the Holding Center use

24

telephones, they first hear a verbal recorded warning that the call is subject to monitoring. (Dkt. No. 41 at 2.) Additionally, inmates at the Holding Center receive an "Inmate Handbook" that includes a notice that calls are subject to monitoring and recording. (Dkt. No. 41-1 at 7.) Black contends that the Government response is inadequate because it does not separate the Holding Center's ordinary safety procedures from the use of telephones for criminal investigations. "The central premise of the defendant's motion is that any notice [that] was provided indicating that inmate telephone communications might be monitored and/or recorded failed to include any notice to the defendant that such conversations might be recorded and later used in an independent criminal prosecution . . . wholly unrelated to the safety or security of the facility and therefore, defendant's implied consent to monitoring or recording would not extend to or authorize such use, and thus fails to provide any lawful justification for such monitoring or recording for use in an independent prosecution." (Dkt. No. 42 at 9–10.) In his post-hearing brief, Black reiterates that "the recordings in question were all either made or provided to outside law enforcement agencies in connection with this case, revealing that the true purpose of the monitoring and recording in this case had no relationship to any *bona fide* institutional goals, but was rather utilized to advance the ongoing criminal investigation of charges in this indictment." (Dkt. No. 252 at 14.) Black also challenges the proof that he received an inmate handbook. "[B]ased on the proof at the hearing—an acknowledgment form bearing a signature not identified as the defendant's, taken from defendant's inactive file at the holding center—defendant may or may not have received the handbook. Further, according to the hearing proof, inmates sign a document acknowledging that they've received a copy of the inmate handbook, which includes

25

notice of monitoring of phone calls, but there is no acknowledgment that they have read the

notice or it was reviewed with them.") (*Id.* at 10.)

At the hearings, retired Erie County Sheriff Deputy Joseph Higgins ("Higgins") testified

about the telephone system at the Holding Center.  Higgins testified that, in general, the

telephone system worked as follows:

> Once an inmate is brought into the holding center, and once he gets
> through his processing, his first—in processing, he is given a six-digit ICN number,
> which is inmate control number, and also he is also asked to provide himself with a
> four-digit pin number that he keeps to himself.  Upon making his phone calls, after
> his first initial phone call, he comes in as a free phone call, he does not have to
> provide the information, the ICN number and pin.  From that time on, once he is
> processed in, any time that he would like to use the telephone, he would pick up
> the phone, and there is a number of them in each housing unit, and there are voice
> prompts that advise him to enter his ICN and pin number and the type of call
> which he would like to make, whether it be a collect call, a debit call, a prepaid call,
> et cetera.
>
> * * *
>
> The inmates are required to meet with a classification officer within—it's got
> to be within 72 hours of their incarceration.  It's generally done within the first 24-
> hours where an inmate will sit down with a classification officer and he is given a
> handbook, an inmate handbook, rule book, and the officer will go through the
> book with the inmate and make sure that the rules, regulations and such are
> pointed out to the inmate, and that he understands what is expected of him while
> he is in the holding center.  And then at the end of the interview, the inmate does
> receive his copy and he also receives the sheet of paper that states he has received
> the interview and has been advised and has—and the inmate signs for that book and
> then that is kept on file.

(Dkt. No. 97 at 10–11.)  Inmates generally would sign a form acknowledging receipt of the

handbook.  (*Id.* at 15.)  The Holding Center personnel files for Green and Black had signed

handbook receipts in them, though Higgins did not have personal knowledge of how Green's and

Black's signatures looked.  (*Id.* at 16–17.)

26

When inmates use the telephone system, a voice prompt provides instructions about placing the call.  "The voice prompt also advises the inmate and the end user or the party who is being called that the call is subject to monitoring or recording." (*Id.* at 19.)  The Holding Center monitoring system was installed "for the safety and security of, you know, the facility itself, as far as the officers go and staff and we wanted to know what was going on . . . . [I]n the past, we've received numerous calls regarding contraband coming into the facility in one way or another.  We stopped escape attempts, assaults on officers, assaults on other inmates." (*Id.* at 21.)

Assessing Black's challenge to the recording of telephone calls requires reviewing the standards for intercepted communications.  Chapter 119 of Title 18 prohibits the interception of "any wire, oral, or electronic communication."  18 U.S.C. § 2511(1).  "'Intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  "'Oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." *Id.* § 2510(2).  Jail telephone calls qualify as oral communications, and recording the calls would qualify as prohibited interception unless an exception within the statute applies.  *See U.S. v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) ("Title III clearly applies to prison monitoring.")  (citations omitted).

Of certain exceptions in Chapter 119 to the prohibition on interceptions, two are relevant here.  "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the

27

communication or one of the parties to the communication has given prior consent to such

interception."  18 U.S.C.  § 2511(2)(c).  Consent from inmates can be implicit where they receive

adequate notice of a jail's recording system.  *See U.S. v. Workman*, 80 F.3d 688, 693 (2d Cir. 1996)

("Consent may be either express or implied.  We have long recognized that, under certain

circumstances, prisoners are deemed to have given consent for purposes of Title III to the

interception of their calls on institutional telephones.") (citations omitted).  Additionally, a means

of intercepting a telephone call does not qualify as an "electronic, mechanical, or other device" if

used "by an investigative or law enforcement officer in the ordinary course of his duties."  *Id.*

§ 2510(5)(a)(ii).  Corrections officers and similar jail officials count as "investigative or law

enforcement officers" because of their ability to investigate crimes or rule violations that occur

where they work.  *See U.S. v. Sababu*, 891 F.2d 1308, 1328 (7th Cir. 1989) ("[P]rison officials are

'investigative or law enforcement officers' within the meaning of § 2510(7).") (citations omitted);

*Crooker v. U.S. Dep't of Justice*, 497 F. Supp. 500, 503 (D. Conn. 1980) ("It is beyond question that

as a part of managing and regulating the day-to-day activities of a correctional institution, prison

officials must be empowered to investigate potential criminal violations in order to preserve the

security and orderly management of the institution; in fact, the Bureau of Prisons' regulations

expressly provide specific procedures for investigating suspected criminal activity.") (citation

omitted).

Here, Black gave implicit consent to a recording system that operated in the ordinary

course.  The Government has submitted sufficient evidence that Black received an inmate

handbook and an interview when he first entered the Holding Center.  The inmate handbook

28

contained a notice that all telephone calls were subject to recording.  Each call started with a verbal

warning about monitoring and recording.  The telephones at the Holding Center had signs posted

on them warning users that any calls could be monitored and recorded.  *Cf. Amen*, 831 F.2d at 379

("Paradiso and Abbamonte impliedly consented to the interception of their telephone calls by use

of the prison telephones.  They were on notice of the prison's interception policy from at least four

sources.  The Code of Federal Regulations provides public notice of the possibility of monitoring.

In addition, inmates receive actual notice.").  The Court is not sure why the notices do not explain

more clearly that every single call is in fact recorded, albeit not necessarily monitored in real time;

the notices, using the phrase "subject to," could suggest that any given call has only a probability of

being recorded.  Nonetheless, the notices sufficed to warn Black that any given call could be

recorded, and Black has not made enough of a showing that a certainty versus a probability of

recording would make a difference to his arguments.  *Cf. U.S. v. Willoughby*, 860 F.2d 15, 21 (2d

Cir. 1988) ("[W]e conclude that [the jail's] practice of automatically taping and randomly

monitoring telephone calls of inmates in the interest of institutional security is not an

unreasonable invasion of the privacy rights of pretrial detainees.").  As for the purpose of the

recording, Black has not controverted the Government's evidence that ordinary policies or safety

concerns were the sole purpose for recording when the recordings occurred.  *Cf. U.S. v. Friedman*,

300 F.3d 111, 123 (2d Cir. 2002) (upholding recording procedures that were "motivated by

legitimate law enforcement motives" and "routine").  Green, who joined Black's motion, might

have a point about "how technology and the practices of law enforcement have outpaced the law,"

in that modern recording technology and storage capacities potentially create vast banks of

29

recorded calls that can be stored indefinitely.  *Compare U.S. v. Conley*, No. CR. 07-04-P-H, 2007

WL 1075166, at *5 (D. Me. Apr. 9, 2007) ("[T]here is no evidence that [the jail] expressed an

object for its monitoring or recording in any of the notices that form the basis for [the inmate's]

consent . . . .") *and U.S. v. Correa*, 220 F. Supp. 2d 61, 65 (D. Mass. 2002) ("Co-defendant Correa

consented to a monitoring and recording system that was unqualified in all relevant aspects.") *with*

*U.S. v. Ganias*, No. 12-240-CR, 2016 WL 3031285, at *14 (2d Cir. May 27, 2016) ("While physical

searches for paper records or other evidence may require agents to rummage at least cursorily

through much private material, the reasonableness of seizure and subsequent retention by the

government of such vast quantities of irrelevant private material was rarely if ever presented in

cases prior to the age of digital storage, and has never before been considered justified, or even

practicable, in such cases.") *and* Lily R. Robinton, *Courting Chaos: Conflicting Guidance from Courts*

*Highlights the Need for Clearer Rules to Govern the Search and Seizure of Digital Evidence*, 12 Yale J. L. &

Tech. 311, 322 (2010) ("The storage capacity of computers today is astonishing.  As of April of

2009, the highest capacity commercial hard drives were capable of storing two terabytes of data.  A

terabyte can hold approximately 1000 hours of video, 250,000 four-minute songs, 1,000,000 thick

books of about 500 pages each, or as much information as can be printed on the paper from

50,000 trees.").  The extent to which modern technology not contemplated by the statute allows

for limitless banks of archived calls, and whether this new technological development needs new

limits, are broader policy issues that require further legislative and appellate guidance.  For this

case, the Government has done enough to show that the recordings were generated lawfully at the

time of interception and that law enforcement agents accessed them only after they had credible

information linking Black to Harper's murder.  The Court thus recommends denying Black's

motion.

> vi.     *Motion to Suppress Derivative Use of Inmate Telephone Calls (Dispositive)*

Following his motion to suppress the inmate telephone calls, Black also wants to suppress

any evidence derived from those calls.  Because the Court has found the recording of the

telephone calls to be proper, the derivative use of the calls also was proper.  The Court thus

recommends denying Black's motion.

> vii.     *Motion to Suppress Other Statements and Evidence (Dispositive)*

Apart from statements connected to telephone calls, Black seeks to suppress other

statements that the Government may use against him.  Black challenges whether law enforcement

agents followed adequate constitutional safeguards, including *Miranda* warnings, and believes that

any statements were not made knowingly and voluntarily.  Specifically, Black moves to suppress

statements that he allegedly made to his parole officer and two police officers during a warrantless

search of his residence at 1586 Delaware Avenue in the City of Buffalo.  (Dkt. No. 140 at 4, 11.)

Since the search occurred without a warrant, consent, or probable cause, in Black's view, tangible

evidence seized from the residence, including a firearm, should be suppressed as well.  Discovery

that the Government provided to Black apparently indicates that parole officers approached

Black's residence and entered without permission as soon as Black opened the door.  (*See id.* at 11–

12.)  The officers allegedly handcuffed Black immediately, searched him, and then searched the

residence.  The Government responds that Black's parole status made the events at his residence

permissible, since defendants on parole have diminished rights compared to pretrial defendants

who are presumed innocent.  (*See* Dkt. No. 146 at 2, 7.)  The Court held previously that a hearing

was not necessary as to any alleged statements but was necessary as to the search of the residence

and the seizure of tangible evidence.  (Dkt. No. 149 at 3, 5.)  Post-hearing, the Government adds

the argument that Black's parole officer "had timely information from a previously reliable

informant that Black had a gun.  Under these circumstances, the search of the defendant's

approved residence was patently related to the parole officer's supervision of the defendant.

Accordingly, a warrant was not required, and no Fourth Amendment violation occurred."  (Dkt.

No. 200 at 4.)  Black challenges the informant's reliability as unknown and questions how stale the

informant's information was by the time the officers used it.  (*See* Dkt. No. 252 at 20.)

Black also moves to suppress statements that he allegedly made to certain cooperating

witnesses.  (*Id.*)  According to Black, the cooperating witnesses deliberately elicited statements from

him when the Government knew that he had counsel.  (*Id.* at 8.)  "Defendant contends that the

government failed to offer sufficient proof at the hearing to demonstrate that these individuals

were *not* acting as government agents when they obtained statements from the defendant that they

thereafter supplied to the government."  (Dkt. No. 252 at 4.)  By leaving the interaction between

Black and the cooperating witnesses outside of counsel's knowledge, the Government violated the

Sixth Amendment.  The Government responds that Black's motion is too conclusory and too

speculative to warrant suppression.  The Court decided previously that a hearing was necessary.

(Dkt. No. 149 at 7.)  Post-hearing, Black adds that "either immediately or at some undetermined

time after obtaining statements from the defendant, each of the cooperating witnesses or their

representatives sought out law enforcement, then met with law enforcement, in some cases, along

with either a state-level prosecutor or the Assistant United States Attorney originally assigned to

this case, for the express purpose of negotiating a benefit in exchange for the information they had to offer." (Dkt. No. 252 at 7.) The Government argues that any statements that Black made to fellow inmates could not have violated the Sixth Amendment. In short, some of the statements occurred before the original indictment on March 6, 2012, meaning that Black's Sixth Amendment right to counsel would not have attached yet. Even if some other statements occurred after the original indictment, according to the Government, the inmates who heard Black make the statements volunteered the information without any solicitation from law enforcement agents.

The Court held an evidentiary hearing on the above issues on October 28, 2014. (*See generally* Dkt. No. 154.) At the start of the hearing, the parties agreed not to relitigate suppression proceedings related to Black's parole violation that occurred in state court. The Government has furnished a transcript of the suppression proceedings and a copy of an order from state court that followed the proceedings. Black agreed that the Court could review the state court proceedings for the facts developed during those proceedings. (Dkt. No. 154 at 6.) The Court will review the state proceedings below. For the remainder of the October 28, 2014 hearing before this Court, the following information emerged. Around January 4, 2010, a state parolee named Jonathan Singletary ("Singletary") notified his parole officer that he had information about Harper's death. (Dkt. No. 154 at 9.) Buffalo Police detective Mordino and Sergeant Rinaldo interviewed Singletary on January 11, 2010. (*Id.* at 10.) Singletary passed along statements about the Harper murder that Black allegedly made to him. At the time of the interview, Singletary was on parole but not otherwise under any cooperation agreement that the interviewers would have known at the

33

time.  Law enforcement agents did not ask Singletary to try to obtain any statements from Black.

Around February 9, 2010, Mordino and Rinaldo interviewed someone by the name of Torrell

Stone ("Stone") in the presence of Stone's counsel and a state prosecutor.  (*Id.* at 11–12.)  Stone

told Mordino and Rinaldo that he was housed with Black at the Holding Center for about a week

and a half and that, during that time, Black made statements about the Harper murder.  Black did

not mention Harper by name.  Stone pled guilty to a state crime a short while after the interview;

Mordino was not aware of any particular benefit that Stone received for passing along the

information at the interview.  (*Id.* at 15.)  Sometime later, on February 7, 2014, Mordino met with

someone named Darnell McIntosh ("McIntosh") at the U.S. Attorney's Office with a federal

prosecutor previously on this case, and with McIntosh's counsel.  During that interview, McIntosh

relayed statements that Black allegedly made about the Harper murder at the Niagara County

Correctional Facility, though Black never mentioned Harper by name.  (*Id.* at 15–16.)  McIntosh

volunteered the information; law enforcement agents did not initiate contact with him.  Mordino

seemed generally aware that McIntosh was looking for cooperation but did not know whether

McIntosh ultimately received any benefit.

      In addition to the information that emerged at the hearing, the Government has

submitted Black's Certificate of Release for his state parole.  (Dkt. No. 200-1.)  A prefatory

paragraph above the conditions began with the sentences, "I, Black, Shaun, voluntarily accept

Parole supervision.  I fully understand that my person, residence and property are subject to search

and inspection."  (*Id.* at 1.)  The Certificate of Release listed a number of conditions that the state

imposed as part of Black's parole.  In condition number four, Black agreed that "I will permit my

Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and properly." (*Id.*)

The Government additionally has submitted a transcript of Black's parole-related suppression hearing before New York State Supreme Court Justice Russell Buscaglia on September 20, 2010. (Dkt. No. 200-1 at 4–100.) At the hearing, state parole officer Sean McPartland ("McPartland") testified that he received information from a confidential informant in December 2009 that Black was in possession of a firearm. (*Id.* at 10; *see also id.* at 22–23, 28 (cross-examination and re-direct regarding the informant's reliability).) McPartland then explained how the tip led him to contemplate a search of Black's residence, given the conditions of parole that he reviewed with Black and to which Black agreed. (*See id.* at 13–14.) With no other law enforcement agencies involved, McPartland and five other parole officers did execute a search at Black's residence on January 7, 2010. (*Id.* at 15.) Black answered the door; the parole officers handcuffed him immediately as a matter of protocol for these types of searches. (*Id.* at 16.) During the ensuing search, one of the officers found a gun in a room off of a hallway. (*Id.* at 17.) McPartland called Buffalo Police to respond to the discovery of the gun but did not ask Black any questions about it. (*Id.* at 17–18.) Parole officer Christopher Mack ("Mack") testified that he was the officer who found the gun. (*Id.* at 48, 50–51.) Mack elaborated that the parole officers called Buffalo Police "[t]o take the gun into evidence. Whenever we find a weapon like this, it all depends on the—if I found a gun on the street, I may take the gun on my own and turn it over, but on something like this where we took it from a parolee's house, they have better expertise than us, and we ask them to come to the scene because that's what we normally do." (*Id.* at 53.) Mack also

added that Black's mother gave the officers permission to search the entire house (*id.* at 54),

though Black's mother later denied ever granting permission (*id.* at 84).  Within a short time,

Black became aware that a gun had been discovered and made a statement to the effect that "I'm

going to beat this charge."  (*Id.* at 55.)

The legal principles that the Court identified above, when assessing a similar motion from

Green, apply here as well.  The record establishes that the confidential informant who set all of the

events in motion had a track record of reliability with the parole officers who investigated the

allegation about a gun.  The parole officers thus had two reasons to enter Black's residence on

January 7, 2010: the conditions of release that authorized routine searches without suspicion, and

the information from the informant that gave the officers reason to think that a violation of parole

was ongoing.  The parole officers planned and executed the search for these two reasons only;

Buffalo Police officers were not involved in any way until after Mack discovered the gun in the

residence.  Under these circumstances, the Court finds no constitutional infirmity with the way in

which the events of January 7, 2010 unfolded.  The Court also finds that any statements that Black

made during the search about the discovery of the gun were voluntary, spontaneous, and

connected to a parole violation as opposed to any separate criminal investigation.

With respect to cooperating witnesses, the Court finds Black's arguments unpersuasive.

"[T]he Sixth Amendment right to counsel attaches at the first adversarial proceeding before a

judicial officer, whatever the exact form of that proceeding might be."  *U.S. v. Rivera*, No. 13-CR-

83S, 2016 WL 2899294, at *6 (W.D.N.Y. May 17, 2016) (Scott, *M.J.*) (report and

recommendation) (summarizing Supreme Court cases).  Of the various statements that Black

allegedly made, only the statements to McIntosh occurred after the filing of the original

indictment on March 6, 2012.  Black's Sixth Amendment rights thus would not have attached to

any pre-indictment statements.  Regarding the statements allegedly made to McIntosh, the record

has established that McIntosh heard the statements before any specific outreach to law

enforcement.  McIntosh also was the one to initiate contact with law enforcement after the

statements occurred.  The scenario here seems to fit the principle that "the Sixth Amendment is

not violated whenever—by luck or happenstance—the State obtains incriminating statements from

the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985)

(citation omitted); *accord Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) ("[A] defendant does not

make out a violation of that right simply by showing that an informant, either through prior

arrangement or voluntarily, reported his incriminating statements to the police.  Rather, the

defendant must demonstrate that the police and their informant took some action, beyond merely

listening, that was designed deliberately to elicit incriminating remarks.").  McIntosh's motivation

to lie about the substance of the statements to curry favor with the Government may well provide

fertile ground for cross-examination at trial but does not require suppression now.

       viii.    *Motion to Suppress Identification Evidence (Dispositive)*

      Black included in his pretrial motions a request to suppress identification evidence as

improperly suggestive.  (Dkt. No. 42 at 8–9; *see also* Dkt. Nos. 111, 140.)  One identification

procedure involved the presentation of a six-photograph array to Callahan.  A photograph of Black

was in this array.  Callahan identified Black in the array but told the presenting detective that

"'don't none of them [photos] look alike,' implying, from the witness's perspective, the

suggestibility of the identification procedures employed by law enforcement.  Thereafter, the same

detective showed the witness a single mugshot photo of the defendant, which he identified

without further comment relative to the suggestibility of the procedure." (Dkt. No. 140 at 10; *see*

*also* Dkt. No. 252 at 8.) Someone named Jeffrey Early identified Black from the same six-

photograph array. A person named Morris Singer identified Black as a participant in a robbery

not related to the charges in this case. The Government responds that Black has not provided

enough information to demonstrate that he stood out impermissibly amidst other photos in the

array or that witnesses did not rely on independent memories to identify him. (Dkt. No. 146 at 5;

Dkt. No. 200 at 8–11.)

Retired Buffalo Police detective Mary Gugliuzza ("Gugliuzza") testified as part of the

October 28, 2014 hearing. Gugliuzza was the lead detective investigating the Harper murder. On

June 15, 2011, Gugliuzza interviewed Callahan after learning from another detective that he

wanted to provide information about the Harper murder. Callahan was accompanied by counsel.

(*Id.* at 43–44.) Callahan explained to Gugliuzza how he masterminded the kidnapping and

robbery of Harper. (*See id.* at 36.) Callahan lured Harper out of his residence, began the

kidnapping, and robbed him, but was not present for the murder. (*See id.* at 36–37.) During the

course of the interview, according to Gugliuzza, Callahan brought up Black's name about two

dozen times. (*Id.*) At some point during the interview, Callahan decided that she wanted to

confirm that the "Shaun Black" to which Callahan kept referring was the Rodshaun Black who is

now a defendant in this case. "I had a mug shot, not a single mug shot, but our long sheet with a

picture of Shaun Black on it, which I wanted to show Antoine Callahan and make a confirmatory

identification if this was the same Shaun Black that he was talking about." (*Id.* at 37.) "I asked

him if this is the same Shaun Black that he has been talking about for the last two hours." (*Id.* at 38.) Callahan said yes, and Gugliuzza inferred that Callahan already knew Black. (*Id.* at 39.) Callahan had not participated in any identification procedures for the Harper case, prior to the interview with Gugliuzza. (*Id.* at 42.)

"The linchpin for admissibility of identification testimony is reliability. In reviewing a due process challenge to the admission of such testimony, we must look at the facts of each case and the totality of the surrounding circumstances. The ultimate questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the circumstances, there is a very substantial likelihood of irreparable misidentification. When a witness has made a pretrial identification, the analysis of whether he is to be permitted to identify the defendant at trial normally requires a one-step or two-step inquiry. The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt. If they were not, the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification. In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) (internal quotation marks and citations omitted).

Here, Black has not made enough of a showing regarding suggestiveness. During his interviews, Callahan was the first person to mention Black and mentioned him repeatedly. Callahan made fairly clear that he knew who Black was and that he would be able to recognize a photograph of him. When agents presented Callahan with a photograph of Black, they asked him

only whether the photograph was of the person whom he knew and discussed extensively. The agents did not try to push Callahan toward linking an unknown person toward a specific role in Harper's death. The frequency with which Callahan referred to Black is consistent with Callahan's statements to Gugliuzza that he masterminded Harper's kidnapping and robbery; those events would have given Callahan occasion to interact with Black as Harper's ultimate fate ran its course. *Cf. U.S. v. Salameh*, 152 F.3d 88, 127 (2d Cir. 1998) (finding an independently reliable identification where the witness pumped gas for the defendant the day of the crime); *U.S. v. Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (finding an independently reliable identification where the witness had a chance to stare at the defendant for "two to three seconds" during a shooting). Jeffrey Early's identification involved a six-photograph array, but nothing about the array indicates that Black's photograph stood out improperly.

The Court accordingly recommends denying Black's motion.

### C. Daniel Rodriguez

Rodriguez filed his omnibus pretrial motions on multiple dates as seen in the docket. (Dkt. Nos. 31, 32, 35, 43.)

#### i. Motion for Bill of Particulars (Non-dispositive)

Rodriguez seeks a Bill of Particulars that specifies, *inter alia*, when he allegedly joined and left the conspiracy; who else joined the conspiracy; and what acts he contributed to the conspiracy. Rodriguez also wants the Government to identify the make, model, and serial number of the weapon allegedly used to kill Harper on December 16, 2009. The Government responds that it "should not be required to furnish particulars relating to the formation of a conspiracy, including when and how it was formed and when a particular defendant joined, because such details need

40

not be proven at trial." (Dkt. No. 38 at 12 (collecting cases).)  The Government also notes that it has furnished dozens of CDs containing information about the case, and that a detailed criminal complaint preceded this case.  No surprise thus is possible here, according to the Government, and it "should never be required to provide the equivalent of an itemized preview of its proof through the device of a bill of particulars lest a defendant tailor his own testimony or that of other witnesses to try to explain away the United States' case." (Dkt. No. 38 at 13–14.)

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  "Moreover, it is of no consequence that the requested information would have required the disclosure of evidence or the theory of the prosecution.  While a bill of particulars is not intended, as such, as a means of learning the government's evidence and theories, if necessary to give the defendant enough information about the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories.  A district court judge, however, has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form." *U.S. v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks and citations omitted).  In Hobbs Act conspiracy cases, courts have ordered "a bill of particulars containing the names of the contractors, construction sites, and projects targeted by the conspiracy." *U.S. v. Mulder*, 273 F.3d 91, 100 (2d Cir. 2001); *see also U.S. v. Coppola*, 671 F.3d 220, 240 (2d Cir. 2012)

41

(noting in passing that a bill of particulars had been issued).  Courts have denied motions for bills of particulars where "the indictment specifies the time, place and nature of the alleged criminal conduct . . . . [and where] the government has produced pursuant to Rule 16 relevant police records from the date of the crime as well as the amended criminal complaint, which further specifies the acts [defendant] is accused of committing."  *U.S. v. Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005); *see also U.S. v. Davis*, No. 06 CR 911 (LBS), 2009 WL 1098477, at *4 (S.D.N.Y. Apr. 21, 2009) (denying a bill of particulars where "the Government has already disclosed that it intends to prove at trial that the targets of the robbery were engaged in interstate drug trafficking, including the purchase of marijuana from California for resale to customers in Manhattan and the Bronx").

Here, the information that Rodriguez has received so far makes a bill of particulars unnecessary.  From the criminal complaint in 12-MJ-2037, Rodriguez has considerable detail about how the kidnapping, robbery, and murder of Harper allegedly unfolded on December 16, 2009.  The superseding indictment contains no charges against Rodriguez pertaining to the alleged offense against M.S. on January 4, 2010.  The large amount of discovery that the Government has furnished likely adds context about who discussed motives and planning for the two alleged robberies.  Rodriguez and all the defendants thus have sufficient notice of the charges against them to allow for the proper preparation of a defense, to avoid surprise at trial, and to protect them from double jeopardy.  The Court accordingly denies the request for a bill of particulars.

      ii.     *Motion for Rule 16 Discovery (Non-dispositive)*

Rodriguez seeks discovery including statements, tests, reports, notes, search warrants, and other items.  Rodriguez also requests notice of wiretaps and prospective Government witnesses.

Finally, if the Government has information that Rodriguez has requested and objects to producing it, then Rodriguez wants formal notice to that effect.  As with Green and Black, the Government cites what it has furnished so far and its continuing obligation to disclose.  To the extent that any specific requests remain outstanding, the Government is directed either to furnish the information or to provide notice of an objection to production.  With respect to Government witnesses, Rule 16 does not apply to fact witnesses, and Rodriguez has not made enough of a showing that the Court should use its inherent authority to require disclosure as explained in *U.S. v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990).  The Court denies Rodriguez's motion without prejudice to renew before the District Judge at the time of trial scheduling.

> iii.    *Motion for Disclosure of Grand Jury Minutes (Non-dispositive)*

Rodriguez included in his motion for discovery a request for the minutes of the grand jury proceedings.  Rodriguez wants the minutes "to determine whether there has been compliance with Rule 6 with regard to attendance and the number of Grand Jurors voting on this indictment." (Dkt. No. 35 at 9.)  "Parties seeking disclosure have the burden of showing that the requested material is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."  *In re Grand Jury Subpoena*, 72 F.3d 271, 274 (2d Cir. 1995) (citation omitted).  Here, Rodriguez's request for disclosure is too speculative.  *See U.S. v. Smith*, 105 F. Supp. 3d 255, 261–62 (W.D.N.Y. 2015).  The Court denies the motion accordingly.

> iv.    *Motion for* Henthorn *Discovery (Non-dispositive)*

Rodriguez seeks disclosure of information that was made available under *U.S. v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).  The requested information includes bias or prior acts of

Government witnesses; information affecting a witness's ability to testify; and impeachment

information in any law enforcement agent's personnel file.  Unless Rodriguez is requesting

preemptive, unlimited discovery of personnel files—which would be denied—he has not explained

how this request differs from the Government's standing obligation to provide *Brady* / Jencks /

*Giglio* information, wherever it may be found.  *See U.S. v. Quinn*, 123 F.3d 1415, 1422 (11th Cir.

1997); *U.S. v. Robinson*, No. 09-CR-203S(SR), 2010 WL 2595314, at *12 (W.D.N.Y. June 24, 2010)

("The Court reminds counsel for the government that *Brady*, *Giglio* and their progeny dictate that

the government's obligation to disclose material favorable to the accused extends to information

that impeaches the credibility of the government's witnesses regardless of the witnesses'

employer."); *U.S. v. Cain*, No. 05-CR-360A(SR), 2007 WL 1385726, at *2 (W.D.N.Y. May 9, 2007)

("This mandate [in *Henthorn*] is, in essence, that which is required under *Brady v. Maryland*, 373

U.S. 83 (1963) and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972).").  The

Court thus denies the motion as moot.

   v. *Motion for Disclosure of Confidential Informants (Non-dispositive)*

  Rodriguez seeks the identities of confidential sources mentioned in prior law enforcement

affidavits.  Rodriguez also wants identifying information about any other confidential sources,

including any promises of leniency and any prior cooperation with law enforcement.  "What is

usually referred to as the informer's privilege is in reality the Government's privilege to withhold

from disclosure the identity of persons who furnish information of violations of law to officers

charged with enforcement of that law.  The purpose of the privilege is the furtherance and

protection of the public interest in effective law enforcement.  The privilege recognizes the

obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.  The scope of the privilege is limited by its underlying purpose.  Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.  A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness.  Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful  to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.  In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action."  *Roviaro v. U.S.*, 353 U.S. 53, 59–61 (1957) (citations omitted).  "The defendant bears the burden of showing the need for disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial.  If such is established, the government's privilege must give way."  *U.S. v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (citations omitted).

Here, Rodriguez has not demonstrated what informant disclosure would accomplish at the pretrial stage that other pretrial discovery has not accomplished already.  *Cf. id.* ("The need for disclosure is far less compelling when, as here, it is sought in connection with a pretrial suppression hearing on issues [probable cause and inconsistencies] which do not bear on defendant's guilt.").  The Government essentially has committed to disclosing informant identities

45

closer to trial, as the District Judge directs.  (*See* Dkt. No. 38 at 4.)  Disclosure in accordance with the eventual trial order will be sufficient.

> vi.    Motion for Brady / Jencks / Giglio Material (Non-dispositive)

Rodriguez's requests here are substantially similar to the requests that Green and Black made.  The Court's rulings for Green and Black apply equally to Rodriguez.

> vii.    Motion for Disclosure of Expert Witnesses (Non-dispositive)

Rodriguez seeks the identity of Government expert witnesses and a summary of anticipated expert witness testimony.  The Government responds that "[e]xpert disclosures and expert summaries will be provided as expert witnesses who will testify at trial are identified by the Government."  (Dkt. No. 38 at 2–3.)  The Court directs the Government to remain mindful of its obligations under Rule 16(a)(1)(G) but otherwise finds that its response is sufficient.

> viii.    Motion for Discovery Under FRE 403, 404(b), 609, and 807 (Non-dispositive)

Rodriguez's requests here are substantially similar to the requests that Green and Black made, except that Rodriguez has included FRE 403 and 807 in his requests.

FRE 807(b) states that proposed evidence under that rule "is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."  The Government currently does not anticipate introducing evidence that would fall under FRE 807 but has agreed to provide reasonable notice if circumstances change.  (*See* Dkt. No. 38 at 7.)

ix.    *Motion to Suppress (Dispositive)*

Rodriguez seeks to suppress statements that he made when questioned by law enforcement agents on January 23, 2010.  Rodriguez contends that he did not receive *Miranda* rights prior to the interrogation.  (*See* Dkt. No. 35-1 at 1.)  The Government responds that Rodriguez was not in custody during the interview and was free to leave at any time, meaning that the need for *Miranda* rights never arose.  (*See* Dkt. No. 38 at 8.)

At the hearings, Rinaldo, Mordino, and Acquino testified about interviewing Rodriguez in January 2010 about Harper's death.  To find Rodriguez, the officers spoke to Rodriguez's sister, who directed them to Rodriguez's mother, who finally directed them to Rodriguez's residence at 2421 Niagara Street.  The officers knocked on the door, and Rodriguez's girlfriend Natasha let them in.  The officers found Rodriguez inside the house and "explained to him that his name had come up in a case and we would like to speak to him at police headquarters."  (Dkt. No. 97 at 35.)  The officers did not specify which case and did not tell Rodriguez that he did not have to come.  (*Id.* at 42, 44).  The officers sometimes conducted interviews in the interviewees' homes, but "most of the time, we like to bring people into the office in case you have to take a statement."  (*Id.* at 140.)  The officers were armed with their standard service weapons but were in plain clothes.  (*See id.* at 41, 141.)  Rodriguez agreed to accompany the officers, and Mordino and Acquino brought him to headquarters in an unmarked police car.  (*Id.*)

Government Exhibit 6 summarizes the substance of Mordino and Acquino's interview with Rodriguez.  The officers began by presenting Rodriguez three photographs serially.  Rodriguez claimed not to recognize photographs of Black and Harper.  Rodriguez did recognize a photograph

47

of Green and allegedly made statements about how he knew Green.  Rodriguez allegedly made a

statement about the last time when he spoke with Green, and the officers believed the statement

to be false.  Rodriguez allegedly made statements about his income and general living and

employment conditions.  The officers "then told Danny that his name came up in a homicide

investigation, and Danny continued to deny any involvement in any homicide.  We had a

conversation with Danny for about 40 minutes, and Danny's only response was that he didn't

know anything, however, one time he referred to, not knowing anything about an incident that

happened that night, that he did not know anything about."  (Gov't Ex. 6 at 2.)  During the

interview, Rodriguez never asked to leave, and the officers never gave Rodriguez any *Miranda*

warnings.  (*See also id.* at 3 ("It should be noted that Danny never asked what the questioning was

about while he was in our company and that he was never handcuffed while in our company.  He

was free to go at any time.").)  *Miranda* warnings did not occur because Rodriguez "was not a

suspect at that time.  He was a person of interest in the case, and he was not in custody."  (Dkt.

No. 97 at 36.)  At the time of the interview, the officers had no forensic evidence linking

Rodriguez to the shooting of Harper.  (*Id.* at 136.)  The officers considered Rodriguez free to leave

at any time during the interview (*id.* at 37), though they never specifically told Rodriguez that he

was free to leave or that he did not have to speak with them (*id.* at 143).  The interview was not

recorded.  At the end of the interview, Mordino and Acquino drove Rodriguez home.

"Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain

purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches,

however, only where there has been such a restriction on a person's freedom as to render him in

custody.  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and editorial marks and citations omitted).  "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*."  *Id.* at 324 (citation omitted).  Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.  Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action."  *Id.* at 325 (internal quotation marks and citations omitted).

In addition to the requirement of custody, the need for *Miranda* warnings also requires that interaction between a person and law enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response

from a suspect thus amounts to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  A

conversation that included no questions about the crime under investigation or the defendant's

conduct would not count as custodial interrogation.  *See Arizona v. Mauro*, 481 U.S. 520, 527

(1987).  Also, "[t]he mere fact of police presence in a police office is not the 'functional equivalent'

of express questioning."  *Isasi v. Herbert*, 176 F. App'x 143, 144 (2d Cir. 2006) (summary order)

(citation omitted).

 Here, Rodriguez has not done enough to show what parts of his interview constituted

either custody or an interrogation.  The officers arrived at Rodriguez's residence in an unmarked

car and dressed in plain clothes.  *Cf. New York v. Quarles*, 467 U.S. 649, 655 (1984) (finding a

defendant in custody where he "was surrounded by at least four police officers and was handcuffed

when the questioning at issue took place"); *U.S. v. Ali*, 86 F.3d 275, 277 (2d Cir. 1996) (finding a

defendant in custody where "he was surrounded by seven officers with visible handguns").  The

officers stated that they wanted Rodriguez to come with them to headquarters; they avoided both a

mandate and an express instruction that he did not have to come.  Nothing in the record suggests

that Rodriguez failed to understand the nature of the request.  Escorting Rodriguez without

handcuffs in an unmarked car was not coercive.  *Cf. U.S. v. Santiago*, 720 F. Supp. 2d 245, 250

(W.D.N.Y. 2010) ("An interrogation at a police station may be non-custodial, and *Miranda*

therefore is inapplicable, where a suspect voluntarily accompanies police officers to the station.")

(citation omitted).  The officers did not take an accusatory approach when presenting the three

photographs to Rodriguez.  Rodriguez perhaps could have guessed that the people depicted in the

three photographs were connected to the same investigation, but the record does not show that

the officers divulged to Rodriguez why they showed him photographs of those three people.  The

officers told Rodriguez inculpatory evidence that his name came up in connection with a

homicide, but the record indicates that the information came to Rodriguez in straightforward

fashion.  The suggestion in the police report that Rodriguez may have "continued to deny"

involvement for as long as 40 minutes causes the Court a little concern about what was asked that

required continual denial.  Nonetheless, Rodriguez has not shown any time in the interview when

the officers mentioned Harper by name or gave Rodriguez any information more specific than "a"

homicide.  The interview ended without incident, and the record in totality contains no

indications that Rodriguez felt pressure from accusatory questions or actions.  *Cf. U.S. v. Wallace*,

178 F. App'x 76, 80 (2d Cir. 2006) (summary order) ("After talking to the detectives for 55

minutes, he expressed a desire to leave, at which point the questioning stopped and the detectives

immediately transported him home."); *U.S. v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir. 1995) (finding

no interrogation where neither a "sociable question nor the general tenor of discussion created an

atmosphere that was reasonably likely to elicit an incriminating response") (internal quotation

marks and citation omitted).  The record also does not contain any sign that a reasonable person

would have wanted to leave but would have felt unable to make the request.  *See U.S. v. Mitchell*,

966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in this circuit have emphasized that in the absence of

actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the

message that the defendant is not free to leave.") (citations omitted).  Under these circumstances,

suppressing Rodriguez's statements would not serve the purpose of "preventing government

officials from using the coercive nature of confinement to extract confessions that would not be

51

given in an unrestrained environment." *Mauro*, 481 U.S. at 529–30 (1987). The Court thus

recommends denying Rodriguez's motion.

     x.    *Motion to Suppress Identification Evidence (Dispositive)*

     Rodriguez filed a supplemental motion on December 28, 2012 to suppress any

identification evidence against him. (Dkt. No. 43 at 4–5; Dkt. No. 49.) Discovery from the

Government indicated that the Buffalo Police Department conducted identification procedures

with a number of witnesses associated with the case, including someone named Sabrina Mack

("Sabrina"). A procedure conducted on January 3, 2011 apparently involved Rodriguez.

Rodriguez is concerned that police officers may have conducted the identification procedures in a

suggestive manner. The suggestiveness would have come from the comparison photographs and

from the angles at which some of the photographs were taken; as an example, Rodriguez has

furnished a copy of the photo array presented to a witness named Edmund Buggs, who was

discussed above with Green's motions. (*See* Dkt. No. 49 at 3; Dkt. No. 49-1.)

     At the evidentiary hearings, Acquino testified that he presented the January 3, 2011 photo

arrays to Sabrina. The three photo arrays[2] contained pictures of Green and Black; Sabrina

identified two pictures positively and one as "looking like" Black. (Dkt. No. 97 at 62, 66.) When

---

[2] For the sake of completeness, the Court should note that this case went through a significant delay concerning the production of the original photo arrays. The Government contended for some time that the original arrays had been lost, but that the Buffalo Police Department's computer system maintained the ability to generate exact replicas. (*See, e.g.*, Dkt. Nos. 95–96; Dkt. No. 97 at 84–104.) Around early April 2014, Rinaldo found the original photo arrays among papers at his house. Defendants expressed a concern "that evidence can be, in fact has been, removed from the files of the Buffalo Police Department without any provision or procedure to maintain the chain of custody of such evidence and without any oversight or supervision by property custody clerks or other officers or support personnel responsible for maintaining the integrity of investigation files even, as in the present case, in murder investigations." (Dkt. No. 111 at 4.) The Court is putting more emphasis on the substance of the suppression issue, but it will defer to the District Judge as to whether the discovery of the original photo arrays in a private house needs to be mentioned at trial.

Sabrina made an identification, she marked a corner of the picture in question and answered questions below the array. (*Id.* at 67.) One of the arrays also contained a picture of Rodriguez; Sabrina identified Rodriguez and noted her identification as she did with the others. (*Id.* at 69–70.) When Acquino assembled the array that included Rodriguez, Sabrina had not told him how Rodriguez looked on the day when she saw Rodriguez. (*Id.* at 75.) Acquino was told general characteristics about Rodriguez and entered those characteristics into a computer system; the system then generated pictures on file from which Acquino could choose. (*Id.* at 76–77.)

Rodriguez did not address this motion in his final post-hearing brief of January 7, 2016. (Dkt. No. 248.) The Government has suggested that the urgency of the motion has diminished with the production of the original photo arrays. "In other words, the Court granted the hearing because the array was missing, not because the defendant had identified any basis to suggest that the photo arrays, or the procedure used in presenting the array, were impermissibly suggestive, which, in the Court's own words, is the otherwise applicable standard before a hearing is warranted. Now that the photo arrays have been located and were immediately disclosed to counsel (on April 8, 2014), it is incumbent on the defendants to 'identify any basis to suggest that the photo arrays, or the procedure used in presenting the array, were impermissibly suggestive.' They have not done so and not attempted to do so." (Dkt. No. 120 at 2.)

After reviewing the hearing exhibits and the parties' submissions, and bearing in mind the standard for suggestiveness under *Maldonado-Rivera*, the Court finds the Government to have the better position. The procedure for generating the photo arrays did not cross the threshold for suggestiveness, and the photographs that Acquino selected did not make Rodriguez stand out in

any notable or legally impermissible way. Rodriguez of course is free to cross-examine Sabrina at trial if the Government calls her as a witness, but nothing about the January 3, 2011 identification warrants suppression. The Court thus recommends denying Rodriguez's motion.

### D. John W. Coronado, Jr.

To avoid repetition, Coronado filed a general joinder of all other defense motions. (Dkt. No. 216.) As the Court noted before, all non-dispositive orders concerning production of discovery, and issues that will be addressed in the District Judge's eventual trial order, will apply to Coronado just as they will to the defendants who made the motions. As for any dispositive recommendations, the issues concerning suppression of specific statements or items seized during parole searches would appear to be specific to the defendants who made the motions and thus would not apply to Coronado. To the extent that any of the Court's dispositive recommendations concern general suppression issues like the recorded jail calls, those recommendations will apply to Coronado as well.

The one distinct motion that Coronado made is a motion for severance and an immediate trial. (Dkt. No. 229.) Although Coronado argues that his situation is very different from that of his codefendants, the Court again defers to the District Judge as to the propriety of holding two or more trials for this case.

### E. Amilcar Ramos

#### i. Non-dispositive Motions

Ramos filed his omnibus pretrial motions on May 1, 2015. (Dkt. No. 201.) Ramos's pretrial motions included the following requests: a bill of particulars; disclosure of confidential informants; preservation of rough notes; Rule 16 discovery; Rule 12(b)(3)(C) notice; and notice of

intent to use identification evidence.  The Court already has addressed these motions when other defendants made them.  For the sake of brevity, the Court applies the same findings to Ramos.  The request for a bill of particulars is denied; the request for disclosure of confidential informants is deferred until trial; and the Government is directed to produce the other requested information or to serve notice of objections, to the extent that it has not done so already.

Ramos has filed other motions that overlap with his co-defendants as well.  Ramos included in his omnibus motions a motion for Brady material.  The analysis of Green's Brady motion applies here.  The Government has acknowledged its affirmative obligations for disclosure under *Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that the District Judge will set in the eventual trial order.  The Government's commitment will suffice, absent a showing that a different arrangement is necessary in this case.  Ramos made a motion for information under FRE 404(b), 608, and 609.  As with Green's motion, to the extent that the Government intends to use at trial evidence falling under these rules, it must give reasonable notice as directed by the District Judge in the trial order.

ii.       *Motion for Voir Dire of Government Experts (Non-dispositive)*

Ramos has made a motion to conduct voir dire of Government experts.  Ramos has phrased his motion entirely in the context of conducting voir dire outside of the presence of the trial jury.  Since Ramos's motion is effectively a motion in limine, the Court defers to the District Judge as to the outcome of this motion.

iii.      *Motion for Severance (Dispositive)*

Ramos has made a motion for severance.  Ramos's motion is a very broad motion to award each defendant in this case a separate trial.  Ramos seeks severance because "[t]he defense would

consider any statement made by a Co-Defendant to be especially critical where a Co-Defendant implicates Mr. Ramos in any criminal activity or overt acts in furtherance of a conspiracy.  It would be of particular significance if a Co-Defendant and/or others have given statements wherein Mr. Ramos was implicated in criminal activity and the deponent exculpated themselves from that criminal activity." (Dkt. No. 201-1 at 6.)  Ramos's rationale is sufficiently speculative at this time that the Court sees no reason to deviate from its ordinary practice.  The District Judge will be in a better position to assess whether the use of co-defendant statements will require two or more trials in this case.  Accordingly, the Court defers to the District Judge as to the outcome of this motion.

> iv.    *Motion for Suppression of Statements (Dispositive)*

Ramos has made a motion to suppress any statements that he might have made during any interrogation as made without proper *Miranda* warnings.  Ramos made this motion in a conclusory fashion upon information and belief, as a placeholder to preserve his rights.  The Government has since confirmed that it is "not aware of any statements that were the result of custodial interrogation, which the government seeks to introduce against the defendant at trial." (Dkt. No. 205 at 15.)  The Court thus recommends denying the motion as moot.

## IV.    CONCLUSION

The Court has made its recommendations for the parties' dispositive motions as explained above.  The Court has granted in part and denied in part the parties' various non-dispositive motions, again as explained above.

## V.    OBJECTIONS

A copy of this combined Decision and Order and Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to the Court's

dispositive recommendations must be electronically filed with the Clerk of the Court within 14

days.  *See* 28 U.S.C. § 636(b)(1); FRCP 59.  "As a rule, a party's failure to object to any purported

error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas*

*v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).


      SO ORDERED.

                    ___/s Hugh B. Scott_____
                    HONORABLE HUGH B. SCOTT
                    UNITED STATES MAGISTRATE JUDGE

DATED: July 6, 2016