UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

John W. Coronado, Jr.,

Defendant.

**Report and Recommendation**
12-CR-83S

## I.  INTRODUCTION

On the night of December 16, 2009, Jabril Harper ("Harper") was kidnapped in Buffalo, New York, robbed, driven across town to Roosevelt Park, and shot dead.  Law enforcement officers believed that defendant John Coronado ("Coronado") had something to do with Harper's murder, and in February 2012, they wanted to talk to him.  Law enforcement officers served Coronado with a grand jury subpoena as part of their desire to talk to him.  Coronado agreed to a voluntary interview but quickly cut it short when he invoked his right to remain silent and requested an attorney.  The Court appointed an attorney in response to the grand jury subpoena.  Within a few weeks, the Government filed the original indictment in this case without bringing Coronado before a grand jury.  The original indictment named three people who are codefendants in this case but not Coronado.

About two and a half years later, the Government filed a superseding indictment that added Coronado and another person to the original three defendants; the superseding indictment also contained additional charges.  A few days later, law enforcement officers arrested Coronado and interrogated him at Buffalo Police headquarters.  The interrogation lasted over two hours.

Coronado signed an advice of rights and waiver form at the beginning, never explicitly invoked his right to remain silent, and never explicitly requested an attorney. Coronado made reference to having an attorney appointed for him in 2012 regarding Harper's murder, but could not remember the attorney's name. After some lengthy give-and-take with the interrogating officers, Coronado made incriminating statements about the night of Harper's murder. Coronado was arraigned the next day, and for nearly two years, he made no reference to the attorney appointed for him in 2012.

Following changes of counsel and an apparent change in pretrial strategy, Coronado filed pretrial motions on September 13, 2016 including a motion to suppress the statements from his interrogation. (Dkt. No. 321 at 2–7.) For the first time, in this motion to suppress, Coronado argues that the counsel appointed to him in 2012 had an attorney-client relationship with him that continued through the present time. Coronado argues that he invoked his right to counsel early in the interrogation. On this basis, Coronado argues that the law enforcement officers' decision to persist with the interrogation violated the Sixth Amendment and Fifth Amendment, along with New York State ethical rules that prohibit attorneys from direct communication with named parties who have counsel. The Government counters that any attorney-client relationship that Coronado had in 2012 expired before the custodial interrogation. The Government notes that if Coronado really believed that he still had an attorney-client relationship at the time of his interrogation then he could have requested that attorney at the interrogation. Coronado, in the Government's view, also had nearly two years to tell the Court and other attorneys appointed for him that he already had counsel.

The Court has arranged for numerous filings, arguments, and hearings concerning Coronado's suppression motion, with the most recent filings occurring on June 16, 2017. After considering the entirety of the record, and for the reasons below, the Court respectfully recommends denying Coronado's motion.

## II.    BACKGROUND

The Court will presume familiarity with the case based on the combined Decision and Order and Report and Recommendation that it issued on July 6, 2016 for the omnibus pretrial motions that Coronado's codefendants filed. (Dkt. Nos. 301, 302.) At that time, Coronado did not file any pretrial motions of his own, with two exceptions. Coronado did file a general joinder of all other codefendants' motions. (Dkt. No. 216.) Coronado also filed a motion for an immediate trial. (Dkt. No. 229.) On March 23, 2016, after Coronado had filed those documents, the Court replaced prior appointed counsel with attorney Alan Hoffman. (Dkt. No. 268.) With new counsel on board, Coronado filed his own omnibus pretrial motions after all. (Dkt. Nos. 321, 322.) The Court has issued a separate Decision and Order to address Coronado's non-dispositive motions. Given the extensive filings and proceedings that occurred regarding Coronado's suppression motion, the Court has decided that the suppression motion merits treatment in its own writing.

In the sections below, the Court will recite only the facts of the case that pertain to the suppression motion (Dkt. No. 321 at 2–7).

### A.    *Grand Jury Subpoena and CJA Appointment*

This case concerns allegations that Coronado and the other defendants kidnapped, robbed, and killed Harper on December 16, 2009; and kidnapped and robbed a second victim

known only as "M.S."; all as part of a violent conspiracy that violated the Hobbs Act. Some basic information about the underlying crimes first appeared in the complaint that the Government filed against a co-defendant on February 23, 2012. (*See* Case No. 12-MJ-2037, Dkt. No. 1.) According to the Government, "Harper was known to BPD [Buffalo Police Department] to be engaged in possessing and distributing drugs out of the Shoreline Apartments in Buffalo, New York. Harper's criminal history includes arrests for criminal possession of a weapon and possession of a controlled substance." (*Id.* at 3.) The Government then explained in the complaint how then-undisclosed accomplices ordered Harper at gunpoint to accompany them to a van outside Harper's residence, where they assaulted him and robbed him. (*Id.* at 5.) After the assault and robbery, Harper was placed in the trunk of a different vehicle, driven to Roosevelt Park, and shot in the head. (*See id.* at 6–7.) The original indictment, filed on March 6, 2012, contained Hobbs Act charges against only codefendants Ernest Green, Rodshaun Black, and Daniel Rodriguez. (Dkt. No. 1.)

Procedural events preceding the original indictment started forming the basis for Coronado's suppression motion. During their investigation, law enforcement officers came across Coronado's name and received information suggesting that he played a role in Harper's murder. The officers decided that they wanted to speak to Coronado, and they were contemplating having him testify before a grand jury. (Dkt. No. 384 at 58.) On or around February 10, 2012, law enforcement officers served Coronado with a grand jury subpoena returnable on February 28, 2012. (Dkt. No. 328-2.) At some point over the next few days, Coronado voluntarily accompanied officers to the United States Attorney's Office for an interview. Coronado did not

feel comfortable answering the questions asked of him, and he requested an attorney. (Dkt. No. 384 at 47; Dkt. No. 434 at 106.) On February 14, 2012, Coronado came before the Court for an *ex parte* determination of his eligibility for assigned counsel. Assistant Federal Public Defender Tracy Hayes[1] accompanied Coronado. The Court conducted a brief colloquy on the record; the Court at the time referred mistakenly to a target letter, but the Government since has confirmed that Coronado never was issued a target letter. The Court thus would have been referring to the subpoena. Following the colloquy, the Court found Coronado eligible and assigned Mr. Hayes's office as counsel. The Court did not cite explicit provisions at the time, but the Federal Public Defender's appointment would have been pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, as well as Section IV(A)(9) of this District's CJA Plan, which allows for representation for any financially eligible person who "is the subject of a federal grand jury subpoena and risks self-incrimination, loss of liberty or contempt of court." Coronado's file made its way to Assistant Federal Public Defender Fonda Kubiak, who represented Coronado from February 14 to February 28, 2012. (Dkt. No. 363 at 21.)

During Ms. Kubiak's brief representation of Coronado, two events occurred. On February 28, 2012, Ms. Kubiak sent a letter to the Assistant United States Attorney ("AUSA") working on the case at the time, Robert Moscati. (Dkt. No. 321-1 at 10–11.) In the letter, Ms. Kubiak informed AUSA Moscati that, while Coronado was told that he was not a target of the investigation, he would nonetheless refuse to testify before a grand jury on Fifth Amendment grounds. On the same day, Ms. Kubiak confirmed that her office had a conflict representing

---

[1] Mr. Hayes worked in this District at the time; to the Court's best knowledge, he currently has the same title in the District of Connecticut.

Coronado.  (Dkt. No. 363 at 21–22.)  Ms. Kubiak learned of the conflict when reading the pre-indictment complaint in this case.  (Dkt. No. 363 at 24.)  Ms. Kubiak's office then arranged to replace her with Kevin Spitler, a private attorney assigned to Coronado under the CJA and this District's CJA Plan.  Despite representations to the contrary, Ms. Kubiak felt that Coronado was in fact a target of the investigation.  (Dkt. No. 363 at 26; *see also id.* at 36 ("During the course of my conversations with Mr. Moscati, it was clear that he was a target; that he was likely to be indicted as a co-conspirator in this case . . . . So although Mr. Moscati's initial representation to me was that he was not a target, it was clear that he was a target and that if he didn't come in to testify, that he would be indicted.").)  The assignment letter that Mr. Spitler received informed him that he would represent Coronado "for a subpoena to testify before the grand jury."  (Dkt. No. 439-1 at 1.)  The Court signed a voucher that authorized Mr. Spitler to bill for his services in accordance with CJA procedures.  (Dkt. No. 321-1 at 8.)

What happened after Mr. Spitler's assignment has been the subject of some dispute between the parties.  Coronado never was brought before a grand jury, and the Government filed the original indictment in this case on March 6, 2012 without naming him as a defendant.  (Dkt. No. 1.)  Coronado has submitted in an affidavit that he "was told that [Spitler] would continue to represent me as concerns the kidnapping and killing of Harper."  (Dkt. No. 321 at 12.)  Mr. Spitler has submitted his own affidavit in which he asserted "that my representation of Coronado would continue and that he was exercising his Fifth Amendment right to neither testify nor give a statement.  That my representation of Coronado did not cease, and I have remained as his attorney since my assignment and up to the present date."  (Dkt. No. 321 at 14.)  In that same affidavit, however, Mr. Spitler conceded that "I received no notification of his indictment until

contacted by his present attorney, Alan S. Hoffman, Esq., to whom I turned my file over on August 15, 2016 and delivered to him by his paralegal on August 16, 2016." (*Id.*; *see also* Dkt. No. 384 at 12 ("I have to state that I was unaware that he [Coronado] had been indicted, and I was unaware that he had been arrested.").) These two statements, in consecutive paragraphs of Mr. Spitler's affidavit, are in tension with, if not in outright contradiction of, each other. If Mr. Spitler had been Coronado's counsel "up to the present date" then surely Coronado or his family would not have let two years of litigation pass with different attorneys. (*See also* Dkt. No. 384 at 34 ("Q. And when Mr. Coronado was initially arrested in December [2014]—I don't mean to trick you with the dates. I think from my notes I think it was December 15th. When he was arrested on the [superseding] indictment, he never called you and said he was arrested? A. No.").) Coronado also would not have let his attorney find out about his indictment third-hand through other attorneys.

Two other points reinforce the Court's skepticism. Mr. Spitler submitted no CJA billing in connection with Coronado. (*See also* Dkt. No. 384 at 23 ("In 2015 I wrote a note to myself, there seems to be no activity, I'm closing my file, and I looked at the number of hours and determined it wasn't worth filing a voucher for.").) Mr. Spitler more or less decided that the matter for which he had been appointed had run its course. (*See* Dkt. No. 384 at 17 ("Having reviewed my time sheets, I know that there was a time when I—I think—it was in 2015 when I decided that nothing was going to happen with the file, and I was going to close it, because I hadn't—I hadn't been contacted by the client, by the U.S. Attorney, by anyone else."); *see also id.* at 23 ("My notes indicate I was assigned on the 28th. I reviewed materials on February 29th of 2012. I met with my client early part of March, either March 1st or March 5th. Then I may have had

one other conversation that I referenced to the conversation in 2013.  March of 2013.  Q. And

that was probably the last time that you had done something on the case?  A. Correct.").)

Additionally, and as will be discussed further below, Coronado could not even remember Mr.

Spitler's name when he was interrogated after his arrest on December 22, 2014.  At most, once the

original indictment issued, Coronado and his family might have made an occasional brief inquiry

to Mr. Spitler as to whether anything further had happened with the investigation.  (*Compare* Dkt.

No. 384 at 13 *and* Dkt. No. 434 at 108 *with* Dkt. No. 384 at 28 ("I don't have a recollection of him

coming in my office.  Whether or not he—he did just stuck his head in at some point and said

'What's going on?' and I said 'Nothing,' or if he called me and said, 'What's going on?' and I said,

'Nothing,' I don't have an independent recollection.  I have nothing in my notes to indicate that

that occurred.").)

    **B.**    ***Superseding Indictment, Arrest, and Counsel***

    The investigation of Coronado continued after the filing of the original indictment.  As

can be seen in the interrogation video discussed below, law enforcement officers continued to talk

to potential sources and continued to gather information about Harper's murder.  Meanwhile, the

file in the United States Attorney's Office passed from Moscati to AUSA Frank Pimentel

("Pimentel").  Pimentel might not have been updated along the way about new information

concerning the investigation.  (*See* Dkt. No. 434 at 43.)  In any event, by December 2014, the

Government made the decision to present the case to a grand jury for a superseding indictment

that included Coronado.  (Dkt. No. 434 at 42.)  The grand jury issued a superseding indictment

that the Government filed under seal on December 12, 2014.  (Dkt. No. 155.)  In the superseding

indictment, the Government included Coronado in all of the counts (Counts 1 through 5) that pertained to the kidnapping and murder of Harper on December 16, 2009.

Law enforcement officers arrested Coronado on December 22, 2014 and brought him to Buffalo Police headquarters for interrogation. The Court will address the interrogation in more detail below. The next day, December 23, 2014, Magistrate Judge H. Kenneth Schroeder, Jr. covered for this Court and arraigned Coronado. John Humann of the Federal Public Defender's Office took the assignment to represent Coronado.[2] During the arraignment, Magistrate Judge Schroeder inquired whether Coronado sought assigned counsel and asked explicitly, "Do you plan on hiring an attorney of your choice? Are you asking the Court to assign an attorney to represent you because you cannot afford to hire an attorney?" (Dkt. No. 364 at 4.) At no time during the arraignment did Coronado or Mr. Humann say anything to the effect that Coronado already had counsel, namely Mr. Spitler.

As the case unfolded, Coronado would prompt additional proceedings regarding his representation. On June 17, 2015, Coronado expressed concern about the quality of his relationship with Mr. Humann. (Dkt. No. 212.) Coronado never mentioned Mr. Spitler as a prior counsel. On October 22, 2015, the Court granted the motion by Mr. Humann to withdraw as counsel. (Dkt. No. 242.) During an extended colloquy that the Court conducted that day, Coronado never mentioned Mr. Spitler. Mr. Humann mentioned his concern about Coronado's approach to changing counsel; he was concerned specifically that Coronado, if convicted, would face a minimum sentence of 30 years and a maximum of life. On October 26, 2015, the Court

---

[2] Though the question is not material to any issues in the case, the record is not clear as to why the Federal Public Defender's Office thought that it was conflicted on February 28, 2012 but not on December 23, 2014.

appointed Michael Deal as CJA counsel for Coronado. (Dkt. No. 244.) Coronado never mentioned Mr. Spitler. Finally, over the course of several proceedings involving a conflict of interest with Mr. Deal, the Court replaced Mr. Deal with Mr. Hoffman and even had to confirm that Mr. Hoffman had no conflicts. (Dkt. Nos. 258, 259, 260, 266, 268, 271, 292.) At no time during any of these proceedings did Coronado mention Mr. Spitler, request Mr. Spitler's assistance, or otherwise indicate that he already had counsel.

From the above information, the Court concludes that Mr. Spitler's representation of Coronado for possible grand jury proceedings expired prior to December 2014. There is no need to pinpoint a precise date. The Court appreciates Mr. Spitler's willingness to have jumped back into the case had Coronado ever asked him to do so. Nonetheless, the relationship between Mr. Spitler and Coronado faded gradually as the threat of grand jury proceedings dissipated. By December 2014, no further communications were occurring, and Coronado did not even think to call Mr. Spitler upon his arrest. An email message generated by the Government shortly after the original indictment reflects how the attorney-client relationship would have faded away gradually. On April 27, 2012, Moscati wrote to FBI Special Agent Eric Sakovics ("Sakovics") about Coronado. Moscati wrote, "As you may recall, Coronado is represented by counsel—do you think it would be helpful, or detrimental, to call his atty and advise him as to what we've learned. To the extent LE is out there looking for him, I wouldn't want to alert Coronado to the fact we know he's armed and are [sic] looking for him—perhaps that would make him more dangerous (??). I guess there are arguments both ways, so wanted to get your thoughts." (Dkt. No. 372-1 at 2; *see also* Dkt. No. 384 at 48.) This email message was potentially interesting earlier because it post-dated the original indictment and potentially provided a clue about Coronado's continued representation.

In light of a full record, the Court concludes that the Government was only taking a precaution a short time after the original indictment, since the possibility of compelling testimony from Coronado was still somewhat fresh. (*See* Dkt. No. 384 at 49.) The email message does not suggest that Mr. Spitler's representation continued through the time of Coronado's arrest over two years later.

## C.    Interview of December 22, 2014

Following his arrest, law enforcement officers transported Coronado to Buffalo Police headquarters for interrogation. The interrogation began in the early evening and lasted over two hours. Sakovics, along with Buffalo Police Detectives Mary Evans ("Evans") and Michael Mordino ("Mordino"), conducted the interrogation and recorded it; the video recording of the interrogation entered into evidence at the suppression hearing as Defense Exhibit E. Coronado has insisted that the interrogation was improper and coercive because of a mix of Fifth and Sixth Amendment violations. (*See* Dkt. No. 436 at 7 ("Even the interrogation of **unrepresented** indicted custodial defendants remains questionable, yet alone for a represented client defendant. Two panels in the Second Circuit disapproved of pre-arraignment interviews, especially upon the poor and unrepresented. This Court is urged to consider this disapproval as part of the totality of the circumstances."). At least in part, Coronado seems to want to make a policy argument about the nature of custodial interrogations. For the sake of a full record, in the event of appellate review and to address Coronado's arguments thoroughly, the Court has prepared the following summary of what it believes are the highlights of the video. The times noted refer to the timestamp that appears throughout the video.

11

- 18:51:40: Video begins.  Evans and Sakovics bring Coronado into the interrogation room in handcuffs; Evans removes the handcuffs; Evans and Sakovics leave briefly.

- 18:56:21: Evans and Sakovics enter the room with Mordino to begin the interrogation.

- 18:57:00: Sakovics explains to Coronado that "before we start talking," he has a form that he wants Coronado to sign.  The form is a *Miranda* advice of rights and waiver form.  Coronado indicates that he understands the form and marks his initials in the appropriate places.  As the ensuing exchanges will make apparent, Coronado does not yet realize what the subject of the interrogation will be.

- 18:58:20: Sakovics asks Coronado to sign in the appropriate place on the form if he is willing to answer questions without an attorney present.  Coronado asks, "You're about to ask me questions?"  Evans replies, "Well, yeah, we want to let you know what's going on, and this gives us permission to have a conversation."  Coronado signs in the appropriate place without asking any more questions and without telling any of the officers that he has an attorney and without asking to see that attorney.

- 18:58:36: Coronado asks Evans, "Can I ask you a question?"  Evans replies, "You can ask whatever you want."  Coronado asks whether he will go home to see his family that night.  Evans replies, "I don't know the answer to that."  Evans then explains that she and Mordino are from Buffalo Police while Sakovics is "federal," and that Coronado was arrested on a federal warrant.  Coronado asks, "How long did I have a warrant, because I'm out on bail for traffic.  I've been going to court and everything."  Evans replies, "It's probably very recent, I would imagine."

- 18:59:32: Sakovics clarifies the date of the warrant as December 12.  Evans informs Coronado that the warrant concerns "something that happened a few years ago."

- 19:00:10: Sakovics advises Coronado that the interrogation is being recorded.  For approximately 15 minutes thereafter, the interrogation diverts into a discussion by Coronado of his incarceration, education, family, and employment history.  Sakovics leaves the room during the conversation.  Coronado sits upright or has his forearms resting on his legs; he uses his hands as he talks; and he looks at the officers directly.  The officers interject with questions and comments.  This part of the interrogation is fairly casual; the officers are trying to establish a rapport with Coronado and are letting him speak as he wishes about his background.

- 19:11:45: Evans steers the discussion back to an event that occurred in December 2009 and how the officers have been gathering information about it.

- 19:13:42: Evans identifies December 17 as the date of the 2009 incident. Evans tells Coronado that "there are two sides to every story," that the officers "learned certain things and heard your name," and "I need to talk to you to see what's true and what's not." Evans also cautions Coronado that "we've done our homework, and, so, we know what happened." Coronado responds, "Well, what, though?"

- 19:15:05: Evans mentions the kidnapping of Jabril Harper but does not refer to Harper by name. Coronado makes a comment that is hard to discern but that sounds as if he is asking for a name of the kidnapping victim. Evans then mentions Harper's name. This point marks the first time when Coronado realizes what the officers want to discuss. Coronado responds, "I was questioned about this already." Evan says, "Okay, that's fine." Coronado then continues, "I actually have a lawyer for this. I was assigned." Coronado explains the events that occurred in 2012 that led to an appointment of counsel, including that he was brought to a building "across the street from the new federal courthouse" and that "there was a federal guy who wanted to talk to me about a homicide. They told me the name that you just said." Coronado recites that he was told in 2012 that he was not a target. During this explanation, Coronado appears relaxed as he places a forearm on a table where Mordino is sitting and leans in to address Mordino and Evans.

- 19:17:15: Coronado explains that "the federal guy" made reference to a grand jury and to bringing Coronado to court for assignment of counsel. Coronado explains that the lawyer who was assigned "took herself off" and was replaced with "a different lawyer." After one meeting during which Coronado was presented with information about Harper, Coronado explains that he did not hear anything about the matter again.

- 19:18:05: Evans reiterates that the officers want to talk to Coronado about what happened that night. Coronado responds, "I can't say anything." Evans replies, "Well, you probably can. Because like I said, we know, we know, we know everything now." Coronado replies, "I told them the same thing, that I had nothing to do with it." Evans tells Coronado that the officers know what happened that night. Coronado replies, "It didn't have nothing to do with me." Evans disagrees, and Coronado says, "I know for a fact that it didn't." At that point, Coronado shifts his body to lean back against the back of the chair and against the wall, assuming more of a slouching posture. Coronado repeats again that he had nothing to do with the matter. Evans then tells Coronado about "different levels of involvement" while Coronado says twice more that he had nothing to do with the matter.

- 19:19:05: Mordino leans in as Evans attempts another approach at the issue. Coronado says again that he had nothing to do with the matter. Coronado shifts posture as Evans now tells him directly that he did.

13

- 19:19:30: Coronado says again, "I didn't do it, I had nothing to do with it." Coronado repeats that he told federal agents back in 2012 that he had nothing to do with the matter and that since then, "everything was fine." Evans explains that the investigation kept going after 2012. When Evans repeats that the officers want to talk to him, Coronado says, "I can't say nothing." Evans then tries to differentiate with Coronado between "what we know you did and what we know you didn't do." Coronado says again, "I didn't do nothing," emphasizing "nothing" with a higher pitch.

- 19:20:18: Mordino interjects and disagrees with Coronado's assertions, saying, "Not according to what we know." Coronado, with a little more of a defensive tone, restates that he was already asked what he knows. Coronado then leans in with his forearms on his legs as Mordino explains what additional information has been obtained since 2012, including conversations or interviews "with at least 50 people." Mordino then says, "We had enough information to present to a grand jury," apparently in an attempt to use the grand jury as an authority figure to prompt Coronado to open up. Mordino also mentions the grand jury's decision to indict Coronado. "Me?" Coronado asks. "Yes, sir," replies Mordino. The mention of the grand jury indictment has a visible impact on Coronado. Coronado folds his arms, tucks his head into his arms, and bends his head and his arms to his knees.

- 19:21:15: Coronado asks, "What did they indict me on?" Mordino reads a summary of the charges from the indictment; Coronado reacts with a hand gesture and bows his head briefly when Mordino mentions discharge of a firearm causing death. Coronado asks again, "They indicted *me* on that?" As Mordino backs his chair away from the table, he says, "Yes sir." Coronado shifts his posture again, looks away from the officers briefly, slouches against the wall and the back of the chair, and waves his arms twice.

- 19:22:00: Mordino pulls back toward the table again as he begins to explain to Coronado how people who talk "get the better end of the stick." Coronado now is dividing his gaze between the officers and the space away from the officers. Coronado says, "They're going to kill me if I say anything to you." Mordino and Evans ask what that means and who is going to kill him, as Coronado looks away. Coronado turns to look at Mordino and replies, in an elevated tone, "People in the street, I don't know what's going on." By this point, a level of agitation in Coronado's voice and body language becomes apparent. Coronado says again, "I can't say nothing." Over Mordino's attempt to interject, Coronado repeats, "I can't, I can't, I can't, I can't say nothing."

- 19:22:27: Coronado continues, "I'm afraid for my life, I can't say nothing, I'm not going to say nothing." The officers lean in and acknowledge Coronado's fear or

agitation by telling him to calm down and to take a deep breath. Mordino asks Coronado if he wants some water. Mordino and Evans try to tell Coronado to relax a little bit. Coronado says, "Nobody can, you can't protect me." Mordino disagrees and says, "We can protect you." Coronado shakes his head, looks away, and disagrees: "My family's out there right now, nobody won't protect my family. I can't talk to you." Coronado repeats that he can't talk to the officers. Mordino says, "Look at me," but Coronado cuts him off and says, "With my record they're going to bring this shit on me anyway, like you said they indicted me." Mordino and Evans are raising their voices a little and trying to talk over Coronado to interject. Agitated cross-talk ensues before Evans again asks Coronado to listen.

- 19:23:05: Evans tries a new approach with Coronado by trying to differentiate the FBI from Buffalo Police. Coronado responds, gesturing with his arms and with an elevated tone, that "I've heard about the FBI"; he then explains that if he talks to the officers then a paper somewhere will note that he is cooperating, "and then they're going to kill me" and his family. Coronado motions his hands and bends to his knees again as he says again, "I can't talk." Evans replies that "you're getting a little bit ahead of yourself" as Coronado puts his hands to his head. Mordino again tells Coronado to "slow down a little bit." Coronado raises his voice as he cuts off Mordino, points to the paper that Mordino had, and notes that he has been charged with murder. As Coronado returns to a crouching posture, Mordino tells him again to slow down.

- 19:23:40: Mordino tells Coronado to look at him while Evans again tries to differentiate different levels of involvement and participation. Evans repeats, "We know who did what that night. We know it. There's no mystery anymore." Coronado picks up on Evans's comment and asks, "You just said that you know everything and who did what so it doesn't matter what I say." Evans replies, "It does! It does! It does!" as Coronado twice crouches with his head to his knees and in his hands. Mordino again tells Coronado to calm down. Coronado states in an elevated tone, "It doesn't matter. No one cares about me. Look at my record, nobody cares about me, they're just going to throw me away in a prison cell!" Mordino again instructs Coronado to stop for a minute and to listen to him.

- 19:24:55: when Coronado finally looks up at Mordino, Mordino tells Coronado that he can help himself. Coronado asks, "How can I help myself? It's over with." Mordino and Evans disagree and tell Coronado that "it's only the beginning." Coronado reminds Mordino and Evans that he has been indicted and pleads, "I'm not going to go home! Look at my record, they're not going to let me go home!" Mordino calms Coronado down and reminds him that "we know what happened. We know how it happened. We know every step of the way what happened." Evans chimes in, "We know why it happened." Mordino says again, "We know. We know everything. I spent five years on this investigation. I know everything. I

know that you can help yourself at this particular time."[3] Coronado asks, "How do you figure that, sir?"

- 19:26:27: As Evans makes another pitch for cooperation, Coronado turns to her and interrupts with, "Why would anybody listen to me? I'm a convicted felon." Mordino responds, "We've been doing this for 30 years. We do this all the time." Mordino explains that Coronado would be used in court. Coronado responds, "I'm gonna die." In a more agitated voice, Coronado continues, "People die every day and they get away with it, killing people every day and they get away with it." Mordino then makes a comment that the Court cannot quite make out but that appears to refute Coronado's point; Coronado responds, "That's not true, sir." Coronado continues, "I got threats already before this happened, before you came to talk to me, after 2012, when they questioned me, I was threatened, sir." Evans asked Coronado who threatened him, but he refused to say. Coronado only explained that he received the threat on the street while working with "CEO for parole."

- 19:28:35: Coronado adds that he received a threatening letter. Coronado leans in to Mordino when explaining that the person who wrote the letter—whom Coronado refused to identify—showed him the letter and let him read it, and then took it back. Coronado slouches briefly in the back of the chair again, looking down, before looking up and explaining to Mordino and Evans what the letter said. Coronado then adds some detail about a possible threat that began with events in the Erie County Holding Center.

- 19:35:17: Coronado and Evans identify the person associated with the threat as a friend of Harper. Coronado apparently never knew the person's name. Coronado continues, "If he knows what happened, there's no reason to do nothing to me." Evans tries to build rapport with Coronado by reiterating one of the themes of the interrogation—that "things happened too fast" on the night of the murder and that certain things happened that should not have happened. Looking down, Coronado responds, "It wasn't part of my plan, period. I didn't do it." Evans responds, "I know. I think that you were under a lot of pressure that night, because I know who else was there, and I know what those boys are all about, and I don't think you're like them." Coronado slouches against the back of the chair, looking down, during Evans's response. Coronado then looks up, gestures with his arms, and pleads, "It don't matter. It don't matter. They don't care, they're gonna

---

[3] The Court has not conducted its own analysis of the sentence that Coronado might face upon conviction. As noted before, though, Mr. Humann stated in court on October 22, 2015 that Coronado faces a minimum sentence of 30 years and a maximum sentence of life. If true then the record is not clear as to whether Evans had been referring to the difference between 30 years and life, to the possibility of a plea to a lesser charge, or to some other cooperation-based benefit that a mandatory minimum sentence would have precluded.

give me time. It doesn't matter. I'm not coming home. They're not gonna let me come home. I've been through this since I was a little kid. They look at me as a career criminal. They're gonna put my life out. I know that for a fact. I know that for a fact, nobody can't tell me different."

- 19:39:40: Evans explains to Coronado that he was in the wrong place at the wrong time. Coronado is not looking at her and is instead looking down. When Evans mentions that Coronado had a car on the night of the murder, he denied having a car in a quiet tone and while still looking down. Coronado asserts again that he can't say anything and says, "I didn't kill nobody, I ain't do nothing." Evans replies, "Right, we know that, that's why we're talking to you. We know that. We know who did what. But I think that you were under extreme pressure to be there and do what people wanted you to do that night." As Evans continues to explain that Coronado went with the flow of the plan that night, Coronado is looking at her but is leaning against the back of the chair and the wall. Coronado says that he understands what Evans is saying.

- 19:41:50: Coronado says, "So this reminds me of '48 Hours'—what's going on, you're trying to get some information from me, you want me to tell on somebody? I can't. It don't matter what I say, I don't believe you." Coronado then folds his arms and bends his head and arms to his knees. Some cross-talk ensues with raised voices on all sides; Coronado is heard saying in an agitated voice, "You can kill me right now," as well as a comment about "something that I didn't even do."

- 19:45:05: Evans has been explaining the function of a grand jury while Coronado sits quietly. At one point, Coronado says, "I respect that. I know that you're just doing your job." Evans later says that she wants to know why certain things happened from Coronado's point of view. Coronado responds, "Nobody cares about that." When Evans says that she cares, Coronado responds, "You're not the judge, though. What I say here doesn't matter. It only matters for the case and for other people, not me."

- 19:45:50: Evans introduces the concept of remorse and tells Coronado, "I'm guessing that you wish that whatever happened that night didn't happen." Coronado responds, "You keep saying 'that night' but I didn't do nothing." Evans replies, "We know, we know what happened that night." Coronado looks away and then looks back. Evans does not accuse Coronado directly of what he did but instead says, "We know what you didn't do and what—what happened that night." Coronado picks up on the omission and asks, "So you're trying to tell me that you know what *I* did?" Evans then says yes. Coronado asks, "What did I do?" Mordino cuts in and says, "John, we're asking you." Coronado shifts left and right in his seat as he looks down.

- 19:46:35: The interrogation now assumes a more direct approach. During some cross-talk, Mordino and Evans raise their volume a little and tell Coronado that he knows what he did. Coronado says again that he didn't do anything as he alternates between looking at the officers and the floor. Mordino and Evans press Coronado to explain what he means by "do nothing." Evans presses Coronado to explain specifically whether "do nothing" means that he didn't kill anybody. Coronado looks up and, using his fingers to count points on a list, explains that he means that he didn't kill anybody and that he didn't discharge a gun (*i.e.*, the charges in the superseding indictment). "That's what you said I was charged with, right?" Mordino then tries to explain that "conspiracy," as it appears in the indictment, "doesn't mean that you did it."

- 19:47:30: Mordino pushes either the indictment or a summary of the charges toward Coronado to show him what the document says. Coronado says, "And all this whole conversation, you said it's being recorded to use against me, right?" Mordino responds, "Am I going to use it *against* you? I hope that I'm going to use it to *help* you." Evans answers that the conversation is being recorded because "it's just the rule." Coronado buries his head into his right elbow, which is resting on the table where Mordino was sitting. Coronado also shifts his posture and wipes his face with his right hand as he shakes his head. Coronado says, "It's not. Nothing that I say here is going to help me. It's over for me. Even though I know for a fact that I didn't do nothing. You did your investigation, you're going to believe whatever you want to believe." Evans responds that she wants to know about Coronado's role that night. Coronado is slouching again, looking down, with his right arm resting on the table and his head leaning against his right hand.

- 19:48:10: Evans explains that some people had larger or smaller roles on the night of the murder. Coronado protests that "I didn't tell you nothing that I did anything, so how can you say that I did anything?" "Because the evidence shows that," Evans replies. Coronado lifts his head and spreads his arms in a sign of protest. As Evans continues to explain how different people play different roles, Coronado shifts his posture and looks down while resting his arms on his knees and his head in his hands. Coronado makes the comment that "I'm not trying to outsmart you." Mordino and Evans raise their voices, telling Coronado that *they* are not trying to outsmart *him* and that he needs to put his thinking cap on.

- 19:50:48: When Coronado leans back and says again that "I had nothing to do with it," Mordino points at him and responds, "John, I can tell just by the look on your face, when she said that, that, you know, you know what your role was, and you know —" Evans cuts in to make the same point, and Coronado is shifting through different postures in his chair. Some cross-talk ensues as Coronado again denies any involvement. Coronado says, "I can't say no more." Mordino then explains that Coronado is there because his role is smaller, and they want to talk to

him first.  Coronado says again that he can't say anything.  Evans repeats that she wants to hear Coronado's perspective.  Coronado, in a quiet voice and while slouching in his chair, says again that he can't say anything.

- 19:53:05: As Evans continues to differentiate Coronado from others involved in the murder, Coronado shakes his head slowly and says, "Nobody's gonna feel sorry for me, man."  Evans replies, "It's not about that.  It's about, are *you* sorry for what happened that night?  And I'm guessing you are."  Coronado, still slouching and using an elevated or strained pitch in his voice, responds, "I'm sorry for *anybody* getting killed.  Especially that kid, they say he's a young kid.  I didn't know him from a hole in the wall, but at the same time, I wouldn't wish that upon nobody."  Evans, nodding along as Coronado spoke, replies, "Exactly!  And that's what I wanted to hear from you.  Because all I have before I meet you is a name on a piece of paper, and what everybody else said, and what the videos show, and what all of that other stuff that gets compiled that we can't talk about and we can't release to the press, you don't hear about it in the news.  It doesn't mean we don't have video, it doesn't mean we don't have the whole nine yards.  It takes a long time to get all that stuff."

- 19:54:20: Evans continues with suggestions that others have opened up about what happened at the park on the night of the murder; Coronado looks at her while slouched in his chair, shoulders drooping, with his right arm resting on the table.  Coronado says, "Yeah but what, I'm the last one?"  Coronado briefly buries his head in his right elbow and then uses his right arm to hold up his head, leaning against his arm.  Evans denies that Coronado is the "last one" and tells him that he has an opportunity to talk about what happened that night.

- 19:54:57: Evans and Mordino ask Coronado whether it is fair to say that the evening ended in a way that was not intended at the beginning.  Coronado looks down, makes a hand gesture, and quietly says, "okay."  Evans continues and asks Coronado whether a kidnapping is the same as someone getting killed.  Coronado answers quietly, "no."  As Evans continues to talk, Coronado interrupts and repeats that, for someone like him with a felony conviction, "it doesn't matter what role they did.  I don't see how."  Coronado then explains, "Who's gonna tell what happened, they're going to end up way worse.  They're going to do time, they're gonna be in jail, in prison, labeled as a snitch.  So whatever happened, they get killed and might not even make it home.  And if they do come home, they're still gonna be labeled as a snitch, who can tell what's gonna happen to their family while they're locked up.  And then, once they do come home . . . they get killed."

- 19:56:45: Evans begins to introduce the concept of witness protection and how the FBI can move whole families in dangerous situations.  Coronado says, "Nobody's gonna help me.  I know that for a fact."  Some crosstalk ensues as Coronado and

Evans raise their voices. Coronado puts his face in his right hand as Evans explains more details about witness protection.

- 19:57:56: For the first time, Evans refers to Coronado as "JB." A few seconds pass, and then Coronado looks up and asks quietly, "What did you just call me?" Evans replies, "JB. Is that your nickname?" Coronado shakes his head, moves his body left and right, and assumes more of a crouching position. He gives a very short laugh suggesting some kind of disbelief. When Evans uses the initials "JB" again, Coronado again gives a short laugh and says, "You keep calling me that." Evans offers to call Coronado "John," but Coronado shakes his head and says, "That's crazy." Coronado's arms remain crossed and crouched.

- 19:58:47: Coronado wipes his right hand across his face; whether he is wiping something specific away, like a tear, is not clear from the video. As Evans continues to explain how she thinks Coronado was drawn into the events of the evening, Coronado says, "Nobody cares about nobody. I want to die right now. I'm dead serious, I wish I do something like pull your gun out and shoot me." Mordino responds, "That's ridiculous." Animated crosstalk ensues; Coronado says, "I'm not trying to be belligerent or ignorant, but I'm dead serious, I've been through . . . ." Coronado's voice cracks with those last words as Mordino cuts him off. Coronado had been gesturing with his hands during the crosstalk but then returns to crouching. Mordino explains the possible benefits of cooperation, but he and Evans emphasize that they cannot make any promises.

- 20:00:18: Coronado again says "I can't say nothing" as Evans continues to explain that she cannot make any promises about any benefits from cooperation. Evans makes a comment about not wanting Coronado to see her in the future as a liar regarding promises; Coronado replies, "I'm not ever going to see you again." Evans disagrees, but Coronado says, "What's the percentage, 85, 95 percent?" Mordino replies, "It depends how this goes tonight."

- 20:01:15: Evans emphasizes that Coronado is not the "leading man." Coronado, leaning against the back of the chair in the wall, replies, "That's what they told me before, they told me that I'm not the target and that they got the people they were going to charge with it. I don't understand why I'm being charged now." Coronado later asks where he is going after the interrogation. Mordino and Evans responded that what happens later is up to "the FBI guy," meaning Sakovics. Coronado repeats that he will never go home.

- 20:05:58: After a few additional minutes of protestations that he cannot help himself as Mordino suggests, and that no one will believe him, Coronado begins to talk by repeating what law enforcement agents told him in 2012 about what they believed happened.

- 20:07:18: Coronado recounts that he told the agents in 2012 that he did not feel comfortable with the questioning and that he wanted a lawyer. Coronado recounts that the agents then took him to the courthouse and told him that, once he had a lawyer, they wanted to talk to him again as soon as possible.

- 20:08:00: Coronado recounts that he told the agent in 2012 that he would "plead the Fifth" if required to appear before a grand jury. Coronado also recounts the conflict of interest that prompted the change of counsel for Ms. Kubiak to Mr. Spitler. Notably, when Coronado reaches the time to refer to Mr. Spitler, he says that he cannot even remember Mr. Spitler's name.

- 20:13:35: Sakovics re-enters the interrogation room.

- 20:15:30: By this time, Coronado has finished reciting the allegations that he read in the federal complaint for this case. Coronado refers to the source providing information for the complaint as a "walking dead man."

- 20:16:40: Mordino steers the interrogation back to Coronado and whether he wants "to do this." Mordino tells Coronado that he was home and didn't have to participate in the interrogation, but that he is offering Coronado a chance to help himself. Coronado spreads his hands and asks how talking would help. Sakovics then explains the investigation from the federal side and casts Harper's murder as an unpopular move on the street. Sakovics also clarifies for Coronado that he was one of the law enforcement agents who interviewed him in 2012; Coronado apparently did not remember Sakovics but then noted that he looked familiar.

- 20:21:30: Sakovics has finished explaining his "sinking ship and lifeboat" analogy regarding federal cooperation and talking before others do to score "points." Coronado asks, "What about my family? I don't care what happens to me." By this time, Coronado is still expressing fear and doubt but is listening to Sakovics more intently and making more eye contact than he had been with Mordino and Evans 30 and 60 minutes earlier.

- 20:22:00: Sakovics has explained that he cares what happens to Coronado, but Coronado responds, "I'm just a fuck-up, man. There ain't nothing special about me. I fucked up my whole life, man." Cross-talk ensues that includes references to remorse and Coronado's daughter. The mention that Coronado's daughter loves him makes Coronado tear up and crouch, with his head on his knees between his arms. Sakovics refers to cooperating as joining "Team America."

- 20:25:40: After explaining that the prosecutor on the case will hear from the agents how cooperative Coronado wants to be, Sakovics asks, "Which conversation would you prefer that the prosecutor knows—John's on Team America, and my

recommendation is we lessen the blow, or it's, you see all those charges right there? It is what it is." Coronado places his head in his hands and on his knees during this proposition.

- 20:27:00: Sakovics asks Coronado to put his trust in the officers with respect to any threats against his family. Sakovics offers to give his direct number to Coronado's family in the event of any threats. Coronado asks for tissues and cries as Sakovics explains what might happen in court the next day. During this part of the exchange, Coronado slouches against the back of the chair in the wall, spreads his legs out in front of him, and is talking quietly to the point that some of his words are inaudible.

- 20:31:30: Coronado explains to the officers that he was waiting to clear up some traffic tickets because he and his family wanted to move to Florida to start a new life. "Street life ain't worth it, man. Nobody—they don't care about each other."

- 20:37:00: Following some discussion about what course of action would best serve his daughter's interests, Coronado tearfully resolves to do "whatever I gotta do, sir, for my family." Coronado then starts directly recounting the events of December 16, 2009 from his perspective.

### D.    Arguments in Motions

Coronado raises three arguments in favor of suppression. The first argument is a violation of *Miranda* and Coronado's Fifth Amendment rights. Coronado asserts that his "custodial waiver of his right to a lawyer and his right to remain silent after his arrest on the indictment warrant, prior to his arraignment, was in violation of the United States Constitution." (Dkt. No. 321 at 2.) Coronado's second argument concerns a violation of his Sixth Amendment rights. According to Coronado, "the custodial interrogation without even notice to his lawyer, violated Judge Curtin's decision in *U.S. v Howard*, 426 F. Supp. 1067 (W.D.N.Y. 1977 John T. Curtin, District Court Judge) and as approved of in *U.S. v Hammad*, 858 F. 2d 834, 841-842 (2nd Cir. 1988), cert. denied 498 U.S. 871 (1990)." (Dkt. No. 321 at 2.) Finally, Coronado argues that the Fifth and Sixth Amendment violations occurred here in a way that also had ethical implications. "NY Disciplinary

Rule 7-104(A)(1) states that an attorney should not communicate with a represented party, as does American Bar Association Model Rule 4.2, and the comment to said rule. Coronado, a, party, was represented by an attorney and should not have been subjected to custodial interrogation under the totality of the circumstances without notice to his counsel." (Dkt. No. 321 at 2.)

The Government opposes Coronado's motion in all respects. The Government asserts that Coronado did not have counsel as of December 22, 2014 because Mr. Spitler's representation was limited to the grand jury subpoena that ran its course. (Dkt. No. 328 at 3.) The Government draws support for this position from events that the Court already has highlighted: No one, including Coronado himself, asked for or referred to Mr. Spitler at arraignment or at any subsequent time until the filing of the pending motion. Without representation at the time of the interrogation, the Government concludes, the law enforcement officers could not have violated the Sixth Amendment. As for the Fifth Amendment, the Government argues that Coronado received proper *Miranda* warnings and signed a knowing and voluntary waiver of his rights. The ensuing interrogation lasted over two hours, and the Government notes that Coronado at no time asked for either the attorney that he supposedly had or any other attorney. To the extent that Coronado is arguing that his request for counsel in 2012 carried over to the interrogation in 2014, "that is foreclosed by *Maryland v. Shatzer*, 559 U.S. 98 (2010), in which the Supreme Court held, in the context of custodial interrogations, that invocation of the right to counsel dissipates after a 14-day break in custody. That is, after a suspect in custody invokes the right to counsel and a 14-day break in custody intervenes, police may administer *Miranda* warnings and again attempt interrogation. *A fortiori*, here, where Coronado was not even in custody when he

requested counsel in February 2012 and nearly three years passed before law enforcement questioned him, there can be no question that his Fifth Amendment rights were not violated." (Dkt. No. 328 at 5.)

In the absence of any Fifth or Sixth Amendment violations, the Government asserts that this case presents no ethical violations. Alternatively, even if some kind of ethical question persisted, the Government argues under *Montejo v. Louisiana*, 556 U.S. 778 (2009), that ethical violations in themselves do not warrant suppression.

## III.   DISCUSSION

### A.    *Suppression Generally and Burden of Proof*

Before addressing the merits of Coronado's motion, a brief note is warranted about the burden of proof in suppression motions involving statements and *Miranda*. As recently as last year, the Second Circuit acknowledged, without resolution, that some confusion exists about who carries what burden in a suppression motion like the one that Coronado has made. *See United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016) (summary order) (collecting cases). A shifting burden, as expressed in some case law, makes sense and will be used here. "The initial burden of production and persuasion generally rests upon the defendant at a suppression hearing." *United States v. Butler*, 59 F. Supp. 3d 648, 651 (D. Vt. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Although defendants generally bear no burden in criminal cases, putting a light initial burden on defendants in suppression motions makes sense because they have to demonstrate at least enough of a potential *Miranda* problem to make a suppression hearing worthwhile. Coronado met his initial burden when he submitted the Moscati email message of April 27, 2012 and affidavits from himself and Mr. Spitler, documents that raised

colorable questions about when he did or did not have counsel. The Court held hearings accordingly. At this point, "[t]he government bears the ultimate burden of establishing by a preponderance of the evidence that law enforcement officers properly advised an accused of his Fifth Amendment rights and that he made a knowing and voluntary waiver of those rights." *Butler*, 59 F. Supp. 3d at 651 (citations omitted). "We apply the preponderance standard to *Miranda* challenges in recognition that *Miranda* is an exclusionary rule aimed at deterring lawless conduct by police and prosecution, and that imposing a higher burden of proof would do little to mitigate prosecutorial overreaching while at the same time concealing troves of probative evidence from the eyes of the jury." *United States v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010) (internal quotation marks and citation omitted). The Court will apply the same standard to Coronado's Sixth Amendment arguments.

### B. Sixth Amendment and Scope of Representation

Of the arguments that Coronado has raised, the Court will start by assessing the allegation of a Sixth Amendment violation. Coronado's arguments begin with the assertion that Mr. Spitler was his counsel "through the present time," and that the interrogation of December 22, 2014 should not have proceeded without contacting Mr. Spitler. If this argument were to prove true then it would have a significant impact on the events that unfolded.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by

invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (internal quotation marks and citations omitted). "[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Id.* at 401; *see also U.S. v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) ("Once the right attaches, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel . . . . [D]eliberate elicitation under the Sixth Amendment covers only those statements obtained as a result of an intentional effort on the part of government officials to secure incriminating statements from the accused.") (internal quotation marks and citations omitted).

A long line of Supreme Court cases has developed when the Sixth Amendment right attaches. In *Massiah v. U.S.*, 377 U.S. 201 (1964), the defendant "was indicted for violating the federal narcotics laws. He retained a lawyer, pleaded not guilty, and was released on bail. While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating statements made by him." *Id.* at 201. By the time the defendant came under surveillance, then, he already retained counsel and went through arraignment. Those events pushed the Supreme Court

to suppress the statements and to "hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206. In *Kirby v. Illinois*, 406 U.S. 682 (1972), the Supreme Court reviewed a number of its prior cases and noted that "while members of the Court have differed as to existence of the right to counsel in the contexts of some of the above cases, all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings." *Id.* at 689. *Brewer* further helped locate the point of Sixth Amendment attachment at arraignment or some similar commencement of adversarial proceedings in court. In *Brewer*, the defendant did not have counsel actually appointed at the time of the solicitation of statements, but he had been arraigned. The occurrence of the arraignment was enough for the Supreme Court to affirm the granting of a habeas corpus petition. "[T]he clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer*, 430 U.S. at 401. In *U.S. v. Gouveia*, 467 U.S. 180 (1984), the Supreme Court added the explicit distinction between arrest and arraignment. "Our speedy trial cases hold that that Sixth Amendment right may attach before an indictment and as early as the time of 'arrest and holding to answer a criminal charge,' but we have never held that the right to counsel attaches at the time of arrest. This difference is readily explainable, given the fact that the speedy trial right and the right to counsel protect different interests. While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest, to minimize the

possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *Id.* at 190 (internal quotation marks and citations omitted). The Supreme Court used *Rothgery v. Gillespie Cty.*, 554 U.S. 191 (2008), to affirm again "that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer," *id.* at 194, and to clarify that the adversarial presence at the appearance can come from either a prosecutor or a police officer.

Against the long line of cases cited above, two Supreme Court cases stand out. One appears to be fairly easy to explain. In *Escobedo v. Illinois*, 378 U.S. 478 (1964), the petitioner already had retained counsel when he was arrested and brought in for police interrogation. Retained counsel went to the police station and wanted to see his client; his client wanted to see his attorney. "At one point, as previously noted, petitioner and his attorney came into each other's view for a few moments but the attorney was quickly ushered away." *Id.* at 481. The Supreme Court ultimately suppressed any statements made during the interrogation. The Supreme Court cited *Massiah* and noted that the petitioner had not been indicted yet, but it felt the need to adapt *Massiah* to the unusual circumstances of the interrogation. "The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of an unsolved crime. Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." *Id.* at 485 (internal quotation

marks and citation omitted).  *Escobedo* thus can be distinguished by its facts, facts not present in Rivera's case.  *See also Kirby*, 406 U.S. at 689 ("Secondly, and perhaps even more important for purely practical purposes, the Court has limited the holding of *Escobedo* to its own facts, and those facts are not remotely akin to the facts of the case before us.") (citation omitted).  The other case is more confusing, probably because of a lack of factual development.  In *Fellers v. U.S.*, 540 U.S. 519 (2004), the defendant was indicted for conspiracy to distribute methamphetamine.  Police arrested the defendant after the indictment and interrogated him in jail.  The Supreme Court ultimately found a Sixth Amendment violation because "the ensuing discussion took place after petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver of petitioner's Sixth Amendment rights."  *Id.* at 524.  *Fellers* explicitly follows the line of cases cited above, but confusion arises because neither the Supreme Court decision nor the appellate decision below clarify when the defendant retained counsel.  At least one other court has acknowledged the confusion that *Fellers* created.  *See U.S. v. Acosta*, 807 F. Supp. 2d 1154, 1186 (N.D. Ga. 2011) (noting "the apparent conflict in the Supreme Court's decisions" concerning Sixth Amendment attachment); *see also United States v. Rivera*, No. 13-CR-83S, 2016 WL 2899294, at *6 (W.D.N.Y. May 17, 2016) (noting the confusion and checking the original *Fellers* district court docket sheet to try to obtain clarification), *report and recommendation adopted*, No. 13-CR-83S, Dkt. No. 380 (July 16, 2016).  Without better factual guidance, the best that this Court can do is to infer that the defendant in *Fellers* did in fact have counsel at the time of his interrogation.  The Court makes this inference based on the Supreme Court's citation to prior precedent without any announcement of a change or expansion; and based on the Supreme Court's brief description that the defendant's

interrogation occurred "outside the presence of counsel." The Court thus concludes that the line

of cases cited above still stands for the principle that, barring very unusual situations like the one

in *Escobedo*, the Sixth Amendment right to counsel attaches at the first adversarial proceeding

before a judicial officer, whatever the exact form of that proceeding might be.

The contours of Coronado's Sixth Amendment rights guide the Court as to how to resolve

his claims of a Sixth Amendment violation. The Court assigned counsel to Coronado in February

2012 in response to a grand jury subpoena. The Sixth Amendment could not have come into play

then because grand jury proceedings are not adversarial proceedings. *See United States v. Vasquez*,

675 F.2d 16, 17 (2d Cir. 1982) ("[T]he fact that a person is the subject of an investigation is not

enough to trigger his Sixth Amendment right to counsel. For a Sixth Amendment right to counsel

to attach, adversarial proceedings must have commenced against an individual, whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment.") (internal quotation

marks and citations omitted); *see also Conn v. Gabbert*, 526 U.S. 286, 292 (1999) ("A grand jury

witness has no constitutional right to have counsel present during the grand jury proceeding . . . .")

(citation omitted). Although it did not articulate the exact legal rationale at the time, the Court

would have assigned counsel to Coronado in 2012 to protect him against possible self-

incrimination had he actually appeared before a grand jury. Ms. Kubiak understood that she was

working to protect Coronado's Fifth Amendment rights when she invoked that amendment

explicitly in her February 28, 2012 letter to AUSA Moscati. (Dkt. No. 321-1 at 10.) If the Sixth

Amendment did not come into play in February 2012 then the only remaining question is

whether a Sixth Amendment problem somehow developed later, as Coronado and Mr. Spitler

cultivated an attorney-client relationship. The answer is no. Factually, as the Court has recounted above, any relationship between Coronado and Mr. Spitler faded after the original indictment issued and completely ran its course by December 2014. Coronado has acknowledged as much when he could not even remember Mr. Spitler's name during the interrogation and never referred to Mr. Spitler during any interrogations or proceedings in this case until the filing of the pending motion. Legally, adversarial proceedings against Coronado simply did not begin until December 23, 2014. Even if somehow a Sixth Amendment concern existed, "[n]o reason exists to assume that a defendant like [Coronado], who has done *nothing at all* to express his intentions with respect to his Sixth Amendment rights, would not be perfectly amenable to speaking with the police without having counsel present. And no reason exists to prohibit the police from inquiring." *Montejo v. Louisiana*, 556 U.S. 778, 789 (2009). Along the same lines, any Sixth Amendment concern that somehow would have existed at the interrogation could be addressed through Coronado's decision to sign the waiver form and to waive his rights including his right to counsel. *See id.* at 786 ("The defendant may waive the [Sixth Amendment] right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment.") (citations omitted). Consequently, the Government has met its burden for this part of Coronado's motion, and any argument for suppression in this case must rest on a legal authority other than the Sixth Amendment. The Court recommends denying Coronado's motion with respect to his Sixth Amendment arguments.

### C.    *Fifth Amendment and* Miranda

The Court next turns its attention to the December 22, 2014 interrogation and whether any Fifth Amendment / *Miranda* violations occurred.  The basic *Miranda* principles are well known.  "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."  *Id.* at 445.

"Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him in custody.  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and editorial marks and citations omitted); *see also Howes v. Fields*, 565 U.S. 499, 508–09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present

a serious danger of coercion.").  "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda."  *Id.* at 324 (citation omitted).  Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.  Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action."  *Id.* at 325 (internal quotation marks and citations omitted).

In addition to the requirement of custody, the need for *Miranda* warnings also requires that interaction between a person and law enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  A conversation that included no questions about the crime under investigation or the defendant's conduct would not count as custodial interrogation.  *See Arizona v. Mauro*, 481 U.S. 520, 527 (1987).  Also, "[t]he mere fact of police presence in a police office is not the 'functional equivalent'

33

of express questioning." *Isasi v. Herbert*, 176 F. App'x 143, 144 (2d Cir. 2006) (summary order) (citation omitted).

Finally, even when a police encounter qualifies as a custodial interrogation, a defendant must assert the right to remain silent. The invocation of the right to remain silent must be unambiguous; if it is then the defendant cuts off all questioning about that offense. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation omitted); *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (citations omitted). "To be unambiguous, an invocation does not need to be a talismanic phrase such as 'I invoke my right to silence under the Fifth Amendment,' but it must be an unequivocal expression that the defendant does not wish to talk with law enforcement. Ambiguity means 'admitting more than one interpretation or reference' or 'having a double meaning or reference.'" *United States v. Mahon*, No. CR 09-712-PHX-DGC, 2010 WL 3954506, at *2 (D. Ariz. Sept. 29, 2010) (citations omitted). The exact level of clarity required in an invocation of the right to remain silent is itself not quite clear and not subject to formula. Generic statements such as "I have nothing to do with anything else," *Gandia v. Hoke*, 648 F. Supp. 1425, 1431 (E.D.N.Y. 1986), or "I'm not going to talk about nothin'," *U.S. v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006); or statements indicating that defendants "are not ready to talk at that time" or want to "sleep on it," *see U.S. v. Al-Muqsit*, 191 F.3d 928, 936–37 (8th Cir. 1999), *vacated in part on other grounds on reh'g en banc sub nom. U.S. v. Logan*, 210 F.3d 820 (8th Cir. 2000), appear not to suffice because they do not relate to a specific investigation, case, or offense. In contrast, a statement like "I got nothing to say" sometimes can be enough to invoke the right. *See, e.g., Commonwealth v. Hearns*, 10 N.E.3d 108, 116 (Mass. 2014) ("The defendant's statement, 'Well then, I don't want to

talk. I haven't got nothing to say,' was a clear invocation of his right to remain silent. The defendant made the statement mere moments after waiving his Miranda protections, indicating an immediate unwillingness to talk.") (citations omitted); *State v. Fletcher*, 500 S.E.2d 668, 677 (N.C. 1998). Repeating comments like "I don't want to talk about that" or "I don't want to talk about any of that stuff" can present a "very close call" that could require suppression under the right circumstances. *Rivera*, 2016 WL 2899294, at *4. Additionally, "responding to some questions while not responding to others" does not constitute an invocation of the right to remain silent. *U.S. v. Jarvis*, 237 F. App'x 636, 639 (2d Cir. 2007) (summary order); *see also Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (denying a habeas corpus petition where the petitioner "initially stated that he did not wish to discuss his involvement in the crime but immediately denied any connection to the robbery and proffered an explanation of his whereabouts at the time of the crime. We do not view this conduct as an invocation of the right to remain silent.").

Here, Coronado falls short on the issue of express invocation. There is no question that Coronado underwent a custodial interrogation on December 22, 2014. A warrant issued for Coronado's arrest, law enforcement officers proceeded to arrest him on that warrant, and the officers questioned him directly about the events that formed the basis for that warrant. The parties do not argue against any of these facts. The problem for Coronado comes when assessing whether he ever invoked his right to remain silent or to consult an attorney. Coronado knows how to request an attorney; the undisputed testimony from multiple witnesses indicates that Coronado cut off the 2012 voluntary interview by saying that he felt uncomfortable proceeding and that he wanted a lawyer. Coronado was not nearly as direct on December 22, 2014.

Coronado made numerous statements such as:

- "I was questioned about this already."

- "I actually have a lawyer for this."

- "I can't say anything."

- "I didn't do it, I had nothing to do with it."

- "They're going to kill me if I say anything to you."

- "Nothing that I say here is going to help me. It's over for me. Even though I know for a fact that I didn't do nothing. You did your investigation, you're going to believe whatever you want to believe."

None of these statements crosses the threshold for the direct invocation that would have been necessary in the first instance. Coronado made all of the statements when questioned about Harper's murder. When asked about his family and work history, Coronado spoke freely and at length. *Cf. State v. Donesay*, 959 P.2d 862, 871 (Kan. 1998) ("In the present case, too, [defendant] did not insist on terminating questioning altogether. First, he said he wanted to give his side of the story, but at a later time. Then he avoided answering questions about shooting [a victim] but willingly continued answering when the police changed subjects."). A statement that Coronado *had* a lawyer was not direct enough compared to a statement that he could have made that he *wanted* one. *Cf. Commonwealth v. Contos*, 754 N.E.2d 647, 656 (Mass. 2001) (unambiguous assertion of *Miranda* rights where the defendant stated, "I think we're going to stop, and I think I'm going to get a lawyer. If this is the way this is going, you're either accusing me or charging me.") (citations omitted). Coronado's statements that he might get killed for talking and that "I can't say anything" might have sufficed as invocations of his *Miranda* rights had he said those

36

things and nothing else. *Cf. United States v. Gomez*, 725 F.3d 1121, 1125 (9th Cir. 2013) (noting, without disagreement, the District Court's decision that a successful invocation occurred after the defendant said, "I can't say anything because my family . . . my family will get killed."); *Mahon*, 2010 WL 3954506, at *3 (finding that "I can't say anything more" was an unambiguous invocation). Again, though, Coronado demonstrated that he was selective in his unwillingness to talk. This selectiveness, taken in totality, undermined any attempt at an initial invocation.

Coronado's selective unwillingness to talk also means, in the alternative, that he waived any invocation that he successfully made. "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *U.S. v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citations omitted). Courts assess the totality of the circumstances when determining the validity of a waiver. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (citations omitted). "Circumstances that support a finding of involuntariness may include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *U.S. v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (internal quotation marks and citations omitted). Here, Coronado indicated in writing that he understood his rights and that he wanted to proceed. *Cf. Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988) ("After the warning, he orally indicated that he understood and signed a written form acknowledging that he comprehended his rights. At a second questioning session, Toste was again warned of his rights in the same explicit fashion. He

again indicated that he understood and signed a statement acknowledging this.") (citation omitted). Coronado then proceeded to respond to most if not all of the questions that the law enforcement officers asked that did not concern Harper. *See Vongvilay v. Lewis*, No. 2:12-CV-2680 CKD P, 2013 WL 6086865, at *9 (E.D. Cal. Nov. 19, 2013) (no Miranda violation where the defendant answered many questions but "consistently refused to identify anyone else involved in the shooting, stating repeatedly that he didn't want to 'snitch'"). Coronado technically did not know the intended topic of conversation when he signed the waiver form, but he has not made enough of a showing that he tried to stop the questioning once he found out. Meanwhile, the officers never drew weapons and never employed impermissibly coercive tactics. *Cf. U.S. v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirming a *Miranda* violation and a suppression of statements where the "agent's statements ruled out that possibility [of future cooperation], and may have created in Anderson's mind a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents"). Under these circumstances, Coronado waived his *Miranda* rights even if he had successfully invoked them in the first place.

With a failure to invoke—or, in the alternative, a waiver having been established— Coronado is left with what appears to be a policy argument about custodial interrogations. For example, Coronado insisted that the Court's private review of the interrogation video, entered into hearing evidence, would not suffice and that the entire interrogation had to be played in court and on the record. (*See, e.g.*, Dkt. No. 363 at 8 ("It [the video] goes to voluntariness and all the rest of it. And you'll see there's more to come yet. Out of fairness to my client, I really want to

play the whole thing.").) Coronado also has argued that "[e]ven the interrogation of **unrepresented** indicted custodial defendants remains questionable, yet alone for a represented client defendant. Two panels in the Second Circuit disapproved of pre-arraignment interviews, especially upon the poor and unrepresented. This Court is urged to consider this disapproval as part of the totality of the circumstances . . . . The post indictment interrogations, prior to arraignment and the assignment of counsel, are disapproved of under the Court's supervisory powers, and under the Fifth and Sixth Amendments." (Dkt. No. 436 at 7.) The Court infers a request for a policy change from Coronado's decision to mention that "[i]f New York law were to be applied, this Court's decision would simply be that Coronado, if represented by counsel after his arrest and prior to arraignment, cannot effectively waive counsel, even if same was done in writing [Ex N Miranda waiver] and is otherwise voluntary." (*Id.* at 5.) In making these arguments, Coronado seems to be emphasizing that the law enforcement officers worked on him in some kind of unsavory way to get statements from him, and that custodial interrogations should not be allowed to proceed like that. The Court will not address any policy arguments except to repeat that nothing happened at the interrogation that runs contrary to established case law. Coronado has a full record before him if he wants to pursue the issue further through the appellate or political processes.

For now, the Government has met its burden for this part of Coronado's motion, and the Court recommends denying Coronado's motion with respect to his Fifth Amendment arguments.

### D.  *Ethics and Due Process*

In the absence of any Sixth Amendment attachment or any violations of the Sixth or Fifth Amendments, the Court declines to address two of Coronado's other arguments. Simply put, if

no attorney-client relationship existed on December 22, 2014 between Coronado, and either Mr. Spitler or any other attorney, then New York's attorney ethics rules do not come into play. Coronado's argument about "procedural due process under the Fourteenth Amendment" (Dkt. No. 436 at 3) does not require further consideration for two reasons. The Fourteenth Amendment applies only to the states, not the federal government; if Coronado meant to refer to the Fifth Amendment then the Supreme Court has explained how "*Miranda* changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements." *Dickerson v. United States*, 530 U.S. 428, 434 (2000).

## IV.    CONCLUSION

Coronado demonstrated in 2012, when he terminated a voluntary interview, that he knew his rights and how to invoke them. He surely still remembered how to invoke his rights two years later when he was arrested and interrogated. Coronado instead chose to sign a waiver form and to speak to law enforcement officers without requesting an attorney and without even mentioning the name of any attorney that he supposedly had. Coronado did not mention any prior attorney's name for almost two more years after his arraignment, until he filed the pending suppression motion. Coronado thus has shown that he did not have an attorney at the time of his interrogation and that he waived his rights to remain silent and to consult any attorney. Coronado's statements thus were knowing and voluntary.

For all of the above reasons, the Court respectfully recommends denying Coronado's suppression motion. (Dkt. No. 321 at 2–7.)

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_

Hon. Hugh B. Scott
United States Magistrate Judge

DATED: July 10, 2017