UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

JOHN W. CORONADO, JR.,
    a/k/a "JB,"

           Defendant.

**DECISION AND ORDER**
12-CR-83S (4)

## I. INTRODUCTION

In a series of motions and submissions, Defendant John W. Coronado, Jr., moves for severance from his co-defendants under Rule 14 of the Federal Rules of Criminal Procedure. (Docket Nos. 229, 322, 500, 549.) He does so principally on the basis that his constitutional right to present a defense will be violated in a joint trial, because the rule in Bruton v. United States will prevent the jury from seeing and hearing an unaltered videotape of his three-hour confession. 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). Because this Court finds that Coronado's inclusion in a joint trial would impermissibly infringe his constitutional right to present a complete defense, his severance motions are granted.

## II. BACKGROUND

### A. The Anticipated Proof and the Indictment

In summary fashion, the government expects that its trial proof will establish the following facts against Coronado and his four co-defendants—Ernest Green, Rodshaun Black, Daniel Rodriguez, and Amilcar Ramos:

1

In the early part of November 2009, defendant [Ernest] Green was released from state prison. Looking for money, Green asked Amilcar Ramos, who he could rob. Ramos told Green about Jabril Harper since Harper had recently purchased a car from Ramos about a month earlier. According to Ramos, [Harper] paid cash for the vehicle, however, Ramos, unbeknownst to Harper, stole the car shortly after the sale. On December 16, 2009, Ramos and another individual (hereinafter CW for Cooperating Witness) were driving in Ramos' van, and Ramos received a telephone call from John Coronado. Coronado indicated he was at the Pine Harbor apartments and that Ramos should come over. When they got there, Coronado was present along with Green, [Rodshaun] Black and Danny Rodriguez. Ramos told them that Harper was "getting money." All agreed to rob Harper, and Black advised that he had a .45 pistol. Because Rodriguez knew Harper, he called Harper and asked him to meet outside to sell him drugs. Rodriguez took the gun from Black because Harper did not know Black and they thought if Black was the one to approach Harper, he might become suspicious and flee. When Harper came out, Rodriguez approached him, displayed the gun, and told him to get into the back of the van. Rodriguez then gave the gun back to Black, who got in the back of the van with Harper. The van then departed the scene with Ramos driving, the CW in the front passenger seat, and Harper and Black in the back seat.

While in the van, Black demanded money from Harper. Harper indicated he had lost his money "to a car," (referring to the car he had bought from Ramos which Ramos had later stolen back from Harper). Black started to hit Harper with the gun and eventually Harper indicated he had approximately $160 and an "8-ball and a half." Black then took the items along with Harper's jewelry and two cell phones. While still inside the van, Black spoke by cell phone to Rodriguez and/or Green, and then told Ramos to drive to 7th Street.

On 7th street, Green, Rodriguez and Coronado arrived in a maroon colored car driven by Coronado, and pulled into a random driveway. The van pulled up next to the maroon car. A discussion ensued and Ramos and the CW were telling Black to let Harper go. Rodriguez said, "no, we gonna take him home," while Green said, "no, I'm not going back to jail." While still in the driveway of this house, Harper was taken out

2

of the van, beaten, and put into the trunk of the maroon car. Black got into the maroon car with Coronado, Green, and Rodriguez. Several independent witnesses observed this and called 911. Coronado drove away in the maroon car with Black, Green, and Rodriguez inside, and Harper in the trunk. Ramos and the CW left in the van.

Ramos dropped the CW off at his house, while Coronado drove the maroon car to Roosevelt Park. At Roosevelt Park, Green and Black took Harper out of the car and walked him into the park. Rodriguez and Coronado stayed in the car. In the park, Black and Green both shot Harper in the head, and then returned to the car. Afterwards, Green, Black, Rodriguez and Coronado went to an apartment in Buffalo, New York to meet Green's girlfriend. At this apartment, Green gave his girlfriend the jewelry which was taken from Harper earlier that night. Because the jewelry had blood on it, Green's girlfriend washed it. Green also gave his girlfriend coats, and other items of clothing to hide and get rid of. Green told his girlfriend that he had robbed someone, and for her to watch the news, and keep him posted. Meanwhile, Ramos and the CW, who were not present at the murder scene or Green's girlfriend's apartment, went home. However, later that night, Ramos called the CW and told him "he's gone" and to "watch the news." The CW watched the news and learned a body had been found in Roosevelt Park.

Later in the evening, Buffalo Police received a 911 call of a body in Roosevelt Park. The Buffalo Police responded and observed a body, later identified as Jabril Harper, laying on the ground with apparent bullet holes in his wrist and head. Recovered at the scene, and later at the morgue, were two fired .45 caliber cartridges, and two fired bullets. An autopsy was performed by the Medical Examiner and determined the cause of death to be two gunshot wounds to the head.

. . .

Finally, the proof will show that on January 4, 2010, Green and Black robbed Morris Singer. During the course of the robbery, Green and Black used similar methods to rob Singer, as they did when they robbed Jabril Harper. In addition, during the robbery of Singer, Green and Black demanded money, threating Singer by telling him that the body in Roosevelt Park

>a couple weeks ago was their work. Green and Black took jewelry from Singer, and also money that Singer's girlfriend was forced to bring to Green and Black.

(Docket No. 504.)

Stemming from these incidents, Coronado and his four co-defendants are charged in a 9-count superseding indictment.

Counts 1 through 5 of the superseding indictment relate to the robbery, extortion, kidnaping, and murder of Jabril Harper. In Counts 1 and 2, each defendant is charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2. In Count 3, each defendant is charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2. In Count 4, Defendants Green, Black, Rodriguez, and Coronado are charged with discharge of a firearm causing death, in violation of 18 U.S.C. §§ 924 (j)(1) and 2. In Count 5, each defendant is charged with the use, brandish, and discharge of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii), (iii) and 2.

Counts 6 through 9 of the superseding indictment relate to the robbery, extortion, and kidnaping of Morris Singer. In Counts 6 and 7, Defendants Green and Black are charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2. In Count 8, Defendants Green and Black are charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2. In Count 9, Defendants Green and Black are charged with the possession and brandish of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii) and 2.

**B.   Coronado's Motions for Severance**

On December 22, 2014, Buffalo Police detectives Mary Evans and Mike Mordino,

4

along with FBI special agent Eric Sakovics, interviewed Coronado for approximately three hours. During the interview, Coronado made incriminating statements about himself and his co-defendants, and he eventually confessed his role in the murder of Jabril Harper. This videotaped interview was the subject of a pretrial motion to suppress, which this Court denied after considering the thorough Report and Recommendation of the Honorable Hugh B. Scott, United States Magistrate Judge. (Docket Nos. 447, 540.)

Coronado's videotaped confession forms the basis of his motions for severance.[1] In his first motion, Coronado sought severance and an immediate trial on the basis that his confession could not be sufficiently sanitized to avoid Bruton problems for his co-defendants while at the same time "allow[ing] the jury to appreciate [his] candor." (Docket No. 229.) In his second motion, Coronado reiterated the Bruton concerns set forth in his first motion and further sought severance on the basis of prejudicial joinder, since he is not named in Counts 6 through 9 of the superseding indictment. (Docket No. 322.) In his third request for severance, Coronado argued that severance was necessary so that he could play the full, unaltered videotape of his confession in front of the jury to establish that his statement was coerced and to prove a since-withdrawn duress defense. (Docket Nos. 500, 551.) Finally, in his most recent submission on October 1, 2017, Coronado seeks severance on the basis that he intends to challenge the voluntariness of his statement under 18 U.S.C. § 3501 (a); to challenge the credibility of Detectives Mordino and Evans; and to establish his own credibility and candor; all of

---

1 Coronado has filed multiple severance motions, in part, because he has had multiple attorneys.

5

which require that the jury see and hear the full, unaltered video confession, as opposed to reviewing an edited, written transcript. (Docket No. 549.)

The government's response to the severance issues in this case has consistently been that joinder of the counts is proper and not prejudicial, and that a sanitized transcript of Coronado's confession will cure any Bruton issues. (Docket Nos. 205, 206, 429.) The government has not, however, responded to Coronado's arguments concerning his desire to play the unredacted video as part of his defense, despite having been afforded the opportunity to do so. (Docket No. 551.)

### III. DISCUSSION AND ANALYSIS

Multiple offenses may properly be charged together in an indictment or information if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8 (a). Similarly, multiple defendants may properly be charged together in an indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8 (b). But even if properly joined, offenses or defendants may be severed if joinder results in prejudice to a defendant or the government. Fed. R. Crim. P. 14 (a). In such a case, the court may provide any relief that justice requires, including ordering separate trials of counts or severing the defendants' trials. Id.

Decisions on severance are reserved to the trial court's discretion and are considered by the Second Circuit to be "virtually unreviewable." See United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993); United States v. LaSanta, 978 F.2d 1300, 1306

(2d Cir. 1992) (quoting United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991)). There is, however, a preference in the federal system that defendants who are indicted together be tried together. See United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983). This is particularly true when the underlying crime involves a common scheme or plan, in which case the slight prejudice to co-defendants is outweighed by the judicial economies resulting from avoiding duplicative trials. See United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003); Cardascia, 951 F.2d at 482. Joint trials are efficient, "play a vital role in the criminal justice system," and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209-10, 107 S. Ct. 1702, 1708, 95 L. Ed. 2d 176 (1987). But the economies realized by a joint trial must in some cases yield to loftier considerations, such as when a joint trial would infringe a defendant's trial right. See Zafiro v. United States, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (holding that courts should grant severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.").

Criminal defendants have Sixth Amendment and Due Process rights to present a complete defense. See Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)); Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); United States v. Blum, 62 F.3d 63, 67 (2d Cir. 1995). As the Second Circuit has noted, it is "well established as a fundamental matter of due process that the

7

defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt." Grotto v. Herbert, 316 F.3d 198, 205-06 (2d Cir. 2003). A defendant also has the right to confront the witnesses against him, including through cross-examination of the government's witnesses at trial so as to test "the believability of a witness and the truth of his testimony." Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); see United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008) ("The Confrontation Clause guarantees a criminal defendant the right to cross-examine government witnesses at trial.").

An essential component of the right to present a complete defense is the right to be heard, which "would be an empty [right] if the [court] were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Crane, 476 U.S. at 690. The law therefore permits a defendant whose confession has been determined to be voluntarily made to nonetheless challenge the voluntariness, truthfulness, and reliability of the confession in front of the jury. See id. This includes exploration of the circumstances surrounding the confession and the manner in which the confession was obtained, both of which are germane to the weight the jury should afford the evidence. Id. at 688-89. These principles are codified at 18 U.S.C. § 3501 (a), which "states that the trial court must permit the jury to hear all relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury

feels it deserves under all the circumstances."[2]  Blie v. Artus, No. 04-CV-4022 (JS), 2008 WL 5401552, at *6 (E.D.N.Y. Dec. 22, 2008); see also United States v. Elfgeeh, 515 F.3d 100, 125-26 (2d Cir. 2008) (discussing requirements of 18 U.S.C. § 3501 (a)).

This Court previously determined that Coronado made his confession voluntarily. And the government has expressed its intention to introduce Coronado's confession against him at trial.  Coronado has a right to present a complete defense and he has indicated that he intends to challenge the voluntariness, truthfulness, and reliability of his confession, which he is entitled to do under 18 U.S.C. § 3501 (a).  In addition, Coronado intends to use the manner and circumstances of his confession to attack the credibility of Mordino and Evans, and to make arguments to the jury concerning what weight it should afford both their testimony and his confession.   These are all permissible components of a complete defense.  See, e.g., United States v. Morel, 751 F. Supp. 2d 423, 428-29 (E.D.N.Y. 2010) (finding under Crane and § 3501 (a) that a defendant is entitled to present specific evidence regarding the circumstances under which he confessed and to have the jury determine, based on its independent assessment of the evidence, what weight to

---

2 Eighteen U.S.C. § 3501 (a) provides as follows:

> In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

Eighteen U.S.C. § 3501 (e) defines "confession" as "any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

9

afford the statement).

But Coronado cannot present his complete defense if the presentation of his confession is limited by the alterations that <u>Bruton</u> would require in a joint trial. First, and importantly, the government has proffered no way in which to sanitize the video of the confession—as opposed to the written transcript—such that it would not be an obvious alteration of the original. See <u>United States v. Jass</u>, 569 F.3d 47, 55 (2d Cir. 2009) (holding that redacted confessions with obvious indications of alteration do not satisfy <u>Bruton</u>). Second, inserting alterations into the original confession or editing it in any way could alter the jury's perception of Coronado's candor and truthfulness with law enforcement, which could negatively affect Coronado's credibility in front of the jury. For example, inserting pronouns or phrases such as "another guy" or "other person" into a written transcript could cause the jury to conclude that Coronado was less than forthcoming with law enforcement. See <u>id.</u> (permitting the possibility of neutral-word substitutions). Finally, as part of his defense, Coronado is entitled to have the jury hear his own unaltered words, view his demeanor, watch his reactions, consider his body language, and assess his emotional state throughout his statement. A sanitized written transcript cannot adequately relay these intangible qualities. In short, Coronado is entitled to present the unaltered video of his confession to the jury, which would be prohibited in a joint trial under <u>Bruton</u>.

Accordingly, this Court finds that Coronado's joinder in this indictment severely prejudices him because it infringes his constitutional right to present a complete defense. Coronado's motions seeking severance from his co-defendants are therefore granted,

and Coronado will be tried separately on Counts 1-5 of the superseding indictment.[3]  See Zafiro, 506 U.S. at 539 (requiring severance under Rule 14 when a joint trial would compromise a defendant's trial right).

### IV.  CONCLUSION

For the reasons stated above, Coronado's Motions for Severance are granted.

### V.  ORDER

IT HEREBY IS ORDERED, that Coronado's Motions for Severance (Docket Nos. 229, 322, 500, 549) are GRANTED.

SO ORDERED.

Dated:   October 19, 2017
         Buffalo, New York

                                            /s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                            United States District Judge

---

[3] Because this Court finds that Coronado's constitutional right to present a complete defense requires severance under Rule 14, Coronado's remaining arguments in support of severance are moot.